UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BEVERLY ANN GRIFFIN, individually and as
Adminstratrix of the Estate of her son, Bradley
Ballard,

Plaintiff,

– against –

The CITY OF NEW YORK; Former Commissioner
DORA B. SCHRIRO; Chief of Department EVELYN
MIRABAL; Warden ROSE AGRO; CORIZON
HEALTH, Inc.; Dr. AHMED HAIDER; Dr. NAGEH
GARAS; Dr. YUGUNDO PARK; LAURA VAN
WYK; ARMEL DURANDISSE; and JANE/JOHN
DOES ## 1-100,

Defendants.

14 CV 7329

14 Civ. _____

**COMPLAINT AND
JURY DEMAND**

**ECF CASE**



## PRELIMINARY STATEMENT

1.      This is a civil rights action brought by Plaintiff Beverly Ann Griffin,

individually and as Adminstratrix of the Estate of her son, Bradley Ballard, who was killed last

year by correction officers and medical and mental health providers on Rikers Island.  The level

of abuse, indifference and misconduct at the heart of this case is stunning and unconscionable.

Over a seven day period, Bradley Ballard was subjected to mistreatment so extreme that it was the

functional equivalent of torture.

2.      The precipitating event giving rise to Mr. Ballard's death was an entirely

innocent act by a clearly mentally ill patient-inmate.  In September 2013, Mr. Ballard, who

suffered from diabetes and schizophrenia, was locked inside his cell on a mental health unit for

seven straight days as punishment for dancing in a way that caused offense to a female officer.

During that time period, he was denied access to the food, water, and medical care that he needed

1

to survive.  Although medical and mental health personnel were required to visit Mr. Ballard twice a day, a nurse entered his cell *only once* during his seven days of confinement and the medicine he was supposed to take twice daily to control his diabetes and schizophrenia was withheld and not otherwise administered to him.  Rather than provide the critical care required, corrections officers and medical staff essentially stood by and watched as Mr. Ballard languished, deteriorated, and ultimately died.

3.      The number of times correctional staff, medical personal and other staff passed by Mr. Ballard's cell while he was in dire circumstances during these seven days—doing nothing to assist or aid him—shocks the conscience.

4.      By the sixth day of his confinement, it was clear that Mr. Ballard had grown so weak, he could not stand.  Unable to endure the stress of his situation, and with his schizophrenia unmedicated, Mr. Ballard engaged in self-mutilation, taking off all of his clothes and tying a rubber band tightly around his genitals.  As Mr. Ballard's body further deteriorated, he also defecated and vomited on himself.  Still, no one entered Mr. Ballard's cell to relieve his suffering.  Hour after hour, throughout the afternoon and evening of September 10, correction officers peered through the window of Mr. Ballard's cell to see him lying on the floor, filthy, naked, and suffering. Instead of making the obviously necessary interventions, multiple staff members inexplicably watch this man suffer, then walked away.

5.      Finally, on September 11, 2013, as midnight approached, medical staff was summoned to the area.  But rather than providing the emergency assistance Mr. Ballard desperately needed, correction officers and medical staff who could have saved his life once again failed to act, unwilling even to touch Mr. Ballard's body, which was covered with feces and

2

vomit.  The rubber band tied around his genitals had cut off circulation for so long that Mr.

Ballard's penis had become grossly infected, its skin eroded off.

6.      As a doctor and two nurses stood by, Mr. Ballard's heart stopped beating.

Mr. Ballard was eventually taken to Elmhurst Hospital Center, but belated efforts to save his life

failed.  In the early morning hours of September 11, 2013, Mr. Ballard died from the stress of his

seven-day ordeal.  The causes of death included ketoacidosis—a poisonous buildup of acids in the

blood due to lack of insulin, which his diabetes medication would have prevented—and sepsis.

On June 3, 2014, the New York City Office of Chief Medical Examiner declared Mr. Ballard's

death a homicide.

7.      New York City and its senior officials are, and have been, aware that the

mental health units at Rikers Island are staffed with insufficiently trained correction officers and

medical and mental health personnel, who routinely abuse and deliberately disregard the medical

needs of mentally ill inmates.  Staff members persistently and improperly use solitary

confinement to punish mentally ill inmates, thus aggravating their problematic  and self-injurious

behaviors, and regularly deny inmates access to needed medical care.  New York City and its

senior officials have consistently, for years, failed to take meaningful and effective steps to curb

the systematic brutality and deliberate indifference that plague Rikers Island's mental health units.

The incidents involving Mr. Ballard are part of a pattern of incidents of similar inhumane and

illegal treatment of mentally ill inmates by Rikers Island correction officers and medical and

mental health providers, and it is neither the first nor the last such incident that resulted in death.

In fact, these failures and abhorrent practices are now the object of both substantial media

attention and government investigation.

8.      Defendants' actions were contrary to law, contrary to sound medical practice, and contrary to the norms of a civilized society.  This complaint, arising from these tragic, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to applicable state and federal civil rights law.

## PARTIES

9.      Bradley Ballard was a citizen of the United States and resided at Rikers Island jail in Bronx County at the time these events occurred.  At the time of his September 11, 2013 homicide, Mr. Ballard was detained at the Anna M. Kross Center ("AMKC") at Rikers Island.

10.      Beverly Ann Griffin is Mr. Ballard's mother and was duly appointed the adminsitratrix of his estate on September 2, 2014.

11.      Defendant City of New York ("the City") is a municipal corporation that, through the Department of Correction ("DOC"), operates a number of detention jails.  Correctional Health Services ("CHS") is a unit within the New York City Department of Health and Mental Hygiene ("DOHMH"), a City agency.  DOHMH, through CHS, is responsible for the provision of medical and mental health care and services to prisoners confined in the City jails, including AMKC.  DOHMH/CHS contracts with Corizon Health, Inc., a private corporation, to provide such care and services.  DOC and DOHMH/CHS, through their senior officials at the central office and in each jail facility, promulgate and implement policies, including those with respect to the use of punitive segregation, the provision of medical and mental health care, and access to medical and mental health and other program services mandated by local law and court orders.  In addition, senior officials in both DOC and DOHMH/CHS are aware of and tolerate

4

certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC and DOHMH/CHS policies or customs. DOC and DOHMH/CHS are also responsible for the appointment, training, supervision, and conduct of all DOC and DOHMH/CHS clinical personnel, including the defendants referenced herein.

12. On information and belief, at all times relevant hereto, defendant Corizon Health, Inc. ("Corizon") provided medical and mental health services to prisoners in DOC correctional facilities, including AMKC. In carrying out its duties, Corizon was required to ensure that the personnel it employed at AMKC complied with all DOC and DOHMH/CHS policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes, and regulations.

13. At all times relevant hereto, defendant Dora B. Schriro was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of her employment as such, and acting under color of state law. On information and belief, Schriro, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, Schriro was also responsible for the care, custody, and control of all inmates housed in the Department's jails. In addition, at all relevant times, Schriro was responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of New York. Defendant Schriro is sued in her individual capacity.

5

14.     At all times relevant hereto defendant Evelyn Mirabal was the Chief of Department of DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of her employment as such, and acting under color of state law.  As Chief of Department, she was the highest-ranking uniformed member of the department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the DOC jails.  She was also responsible for the care, custody, and control of all inmates in the DOC jails.  Defendant Mirabal is sued in jer individual capacity.

15.     At all times relevant hereto, defendant Rose Agro was the Warden of the AMKC within DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of her employment as such, and acting under color of state law.  As Warden, her responsibilities included the care, custody, and control of all inmates, as well as the supervision of all staff, in the AMKC.  Defendant Agro is sued in her individual capacity.

16.     Defendants Schriro, Mirabal, and Agro (collectively "the Senior Defendants") were, at all times relevant hereto, senior officials who exercised policymaking, supervisory, and disciplinary authority on behalf DOC.

17.     On information and belief, at all times relevant hereto, defendant Dr. Ahmed Haider was a physician employed by the City or Corizon and assigned to Rikers Island between September 4, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical care to patients at Rikers Island, including Mr. Ballard.

18.     On information and belief, at all times relevant hereto, defendant Dr. Nageh Garas was a physician employed by the City or Corizon and assigned to Rikers Island between September 4, 2013 and September 11, 2013.  He was responsible for the provision of

appropriate medical care to patients at Rikers Island, including Mr. Ballard.

19.     On information and belief, at all times relevant hereto, defendant Dr.
Yugundo Park was a physician employed by the City or Corizon and assigned to Rikers Island
between September 4, 2013 and September 11, 2013.  He was responsible for the provision of
appropriate medical care to patients at Rikers Island, including Mr. Ballard.

20.     On information and belief, at all times relevant hereto, defendant Laura
Van Wyk, was a licensed social worker employed by the City or Corizon and assigned to Rikers
Island between September 4, 2013 and September 11, 2013.  She was responsible for the
provision of appropriate medical care to patients at Rikers Island, including Mr. Ballard.

21.     On information and belief, at all times relevant hereto, defendant Armel
Durandisse was a licensed nurse practitioner employed by the City or Corizon and assigned to
Rikers Island between September 4, 2013 and September 11, 2013.  She was responsible for the
provision of appropriate medical care to patients at Rikers Island, including Mr. Ballard.

22.     On information and belief, at all times relevant hereto, defendants
Jane/John Doe ## 1-25, Haider, Garas, Park, Van Wyk, and Durandisse ("the Medical
Defendants") were physicians, physician's assistants, social workers, mental health clinicians, and
other medical and mental health providers, employed by the City or Corizon between September
4, 2013 and September 11, 2013, who were responsible for the medical care of inmates on AMKC
unit C-71 on those dates and/or participated in, and/or had knowledge of and failed to intervene
in, the denial of adequate medical care to Mr. Ballard that took place on those dates.  Their duties
included but were not limited to caring for all patients in their assigned areas at Rikers Island,
which included but was not limited to cell visits, physical and psychological examinations,

identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers at Rikers Island, direct oversight and supervision of nursing staff, and/or provision of emergency medical care.  At all relevant times hereto, the Medical Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, and/or contracted personnel of defendant City.  Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of City jails, including DOCH and DOHMH/CHS policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations.  The Medical Defendants are sued in their individual capacities.

23.     At all times relevant hereto, defendants Jane/John Doe ## 26-100  ("the Officer Defendants") were officers of DOC, including but not limited to assistant deputy wardens, captains, and correction officers, between September 4, 2013 and September 12, 2013, who participated in and/or had knowledge of and failed to intervene in the solitary confinement of and denial of adequate medical care to Mr. Ballard on those dates.  At all times relevant hereto, the Officer Defendants were acting under color of state law and within the scope of their capacities as agents, servants, and employees of defendant City.  The Officer Defendants are sued in their individual capacities.

24.     The Senior Defendants, Officer Defendants, and Medical Defendants are referred to collectively herein as "the Individual Defendants."

25.     Defendants Jane/John Does # 1-100 are sued under fictitious designations because plaintiff has not been able to ascertain their names and, where relevant, shield numbers,

8

not withstanding reasonable efforts to do so.

## JURISDICTION AND VENUE

26.     This action arises under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and New York state common law and constitution.

27.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

28.     The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

29.     Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

**The September 2013 Mistreatment and Homicide of Mr. Ballard**

30.     On June 13, 2013, Bradley Ballard was admitted to DOC custody on a parole violation for failure to report a change of address. For seventeen days, Mr. Ballard was housed in the general population at Rikers Island.

31.     At the time of his arrest, Mr. Ballard was 39 years old.  He suffered from diabetes and schizophrenia, and while incarcerated he demonstrated delusional and paranoid behavior.

32.     Mr. Ballard was therefore in obvious need of specialized medical and psychiatric treatment.

33.     On July 1, 2013, Mr. Ballard was taken to Bellevue Hospital for a psychiatric evaluation. There, Mr. Ballard's diagnoses of schizophrenia and diabetes were confirmed, and he was prescribed a continued regimen of Metformin and insulin for his diabetes and a new assortment of antipsychotic drugs for his schizophrenia.  He was admitted to the hospital and remained at its psychiatric prison ward for 38 days.

34.     After Mr. Ballard's discharge from Bellevue Hospital on August 7, 2013, he returned to Rikers Island, where he underwent a psychiatric assessment.  Mr. Ballard was again found to be suffering from psychosis.  Mr. Ballard's CHS records were updated to reflect this determination and to note his longstanding history of chronic mental illness, self-harm, and suicide attempts.  The records also reflected that Mr. Ballard was resistant to taking psychiatric medication and therefore needed to be observed closely.  At the direction of a CHS supervising psychiatrist, Mr. Ballard was transferred to Anna M. Kross Center ("AMKC") unit C-71, a mental health unit, so that he might be able to receive a higher level of care than available to inmates in the general population.

35.     DOC policy required that Mr. Ballard be permitted to spend 14 hours each day outside of his cell while housed on unit C-17.  In accordance with this policy, Mr. Ballard was locked out of his cell at approximately 8:30 a.m. on Wednesday, September 4, 2013.

36.     At approximately 2:00 p.m. that afternoon, while standing in a common area, Mr. Ballard began to dance, turning in circles.  He took off his shirt, twisted it up in his hands, and thrust it up and down as he danced.

37.     Not recognizing or not caring that Mr. Ballard's dance was a manifestation of his mental illness, a female Officer Defendant took offense at the phallic shape of Mr. Ballard's

10

rolled up shirt and the sexual nature of his movements.  To punish Mr. Ballard for his perceived

disrespect, two Officer Defendants forced Mr. Ballard back into his cell, even though he should

have been permitted to remain outside the cell for the rest of the afternoon.

38.     From approximately 2:50 pm on Wednesday, September 4 until

approximately 11 p.m. on Tuesday, September 10, Mr. Ballard remained locked inside his cell by

the Officer Defendants, who wanted to teach him a lesson for the offense that his dance had

caused.  Throughout that nearly seven-day period, Mr. Ballard was not once permitted to leave his

cell, and the Officer Defendants and Medical Defendants responsible for his care denied him

access to food, water, medication, and medical and mental health treatment.

39.     Mr. Ballard was confined to his cell without any legal authority and indeed

contrary to DOC rules and regulations, and was never offered an opportunity to contest his

solitary confinement and the attendant deprivations of liberty.

40.     The Officer and Medical Defendants were or should have been aware of

Mr. Ballard's mental illness and his history of self-harm.  Indeed, Mr. Ballard's CHS records

indicated that as recently as September 2, 2013, he had been treated for self-inflicted lacerations

and scratches to his head and forearms.

41.     The Officer and Medical Defendants also were or should have been aware

of solitary confinement's propensity to exacerbate the most dangerous symptoms of mental

illness, including self-mutilation.

42.     Because of the extreme vulnerability of individuals with mental illnesses to

the pathogenic effects of solitary confinement, City regulations require that an individual like Mr.

Ballard, who is being treated for mental disorders, be placed in seclusion only for therapeutic, and

never for punitive, reasons, and only at the direction of a psychiatrist.

43.     City regulations further require that such an individual who is held in seclusion be kept under constant observation, reviewed and documented in writing by nursing or mental health staff at least every half hour, and that after four hours, the individual must be released or, if too disturbed and dangerous, transferred to a municipal hospital ward.

44.     The Officer and Medical Defendants, who were responsible for Mr. Ballard's care between September 4, 2013 and his death on September 11, 2013, utterly disregarded these regulations and deliberately neglected Mr. Ballard's need for medical treatment.

45.     Mr. Ballard had a mental health appointment scheduled for September 4, but Laura Van Wyk, the social worker who was supposed to conduct the appointment never saw Mr. Ballard.  And although he had been prescribed Metformin, to be taken twice a day for his diabetes, and an antipsychotic to be taken each day at bedtime, the Medical Defendants, who were required to visit his cell at least twice daily, never visited his cell that day or otherwise provided him with the medication he required.

46.     In the early morning hours of Thursday, September 5, Mr. Ballard's cell began to flood.  Multiple Officer Defendants, including a captain, looked inside his cell repeatedly, but none of them entered or took any steps to help Mr. Ballard clean his cell, provide him with access to clean water, or determine whether he required medical or mental health attention.  In fact the only step that any of the Officer Defendants took to address the flood in Mr. Ballard's cell was to summon a plumber the next morning, who turned off the water to Mr. Ballard's cell, leaving him without access to water until his death.

47.      Throughout the day on September 5, Mr. Ballard continued to be ignored

12

by the Officer and Medical Defendants.  At around 5:00 p.m. that evening, a Medical Defendant stood outside the door of Mr. Ballard's cell and spoke to him for a matter of seconds but remarkably did not enter to evaluate his physical or mental state or provide him with medication.

48.     Additional Medical Defendants entered the housing area and provided other inmates with medication throughout the day, but none stopped to speak with Mr. Ballard or in any way attend to him.

49.     At no time on September 5 was Mr. Ballard offered food, water, or medication.

50.     That night and the following morning, the Defendant Officers on duty, including a captain and an assistant deputy warden, looked into Mr. Ballard's cell dozens of times, but no one attended to him in any way.  Medical Defendants entered the housing area, but none paid any attention to Mr. Ballard.  By the morning of Friday, September 6, Mr. Ballard was beginning his second full day without food or medicine.

51.     On September 6, Officer Defendants, including two captains and an assistant deputy warden, repeatedly stopped outside the door to Mr. Ballard's cell, sometimes looking in through the window, sometimes speaking to him briefly.  They were acutely aware of Mr. Ballard's rapidly deteriorating mental and physical health, as his schizophrenia and diabetes grew increasingly uncontrolled.

52.     Again, the medical and mental health Providers responsible for Mr. Ballard's unit on September 6 paid no attention to him, and they did not provide him with any medication, food, water, or care.

53.     Throughout the night of September 6 and the morning of Saturday,

September 7, Officer Defendants, again including an assistant deputy warden, continued to look into Mr. Ballard's cell without doing anything more.  That afternoon, a Medical Defendant stood outside of the cell and spoke with an Officer Defendant for less than a minute before moving on without speaking to Mr. Ballard.  A second Medical Defendant visited the housing area later that afternoon but did not approach Mr. Ballard's cell.  As day turned into night, and the morning of Sunday, September 8 arrived, the Officer Defendants on duty, including three captains, continued to look into Mr. Ballard's cell, witnessing his increasing distress but doing nothing to stop it.  Medical Defendants continued to visit inmates on the unit, but none of them spoke to Mr. Ballard.

54.     On September 8, Mr. Ballard was given medication for the first time in four days.  A nurse visited his cell and offered him medication but did not ensure that he took it or offer him counseling or any of the other medical or mental health care that he desperately needed.

55.     That night, and early the following morning, Officer Defendants continued to peer inside Mr. Ballard's cell.  At around 10:30 on the morning of Monday, September 9, two Officer Defendants—a deputy warden and an assistant deputy warden—toured Mr. Ballard's unit. The assistant deputy warden opened Mr. Ballard's door and spoke with him briefly.

56.     By now, after five days of inhumane, unjustified, and illegal segregation and deprivation, Mr. Ballard's acute physical and mental suffering and deterioration were glaringly obvious.  Nonetheless, after about two minutes of conversation with Mr. Ballard, the deputy and assistant deputy wardens directed that Mr. Ballard's cell again be locked, and they left him, once again, to himself.  Throughout the remainder of the day, Officer Defendants looked into Mr. Ballard's cell and spoke with him but did not provide him with food, water, medicine, or care.  Medical Defendants passed through the unit but did not stop at Mr. Ballard's cell.

14

57.     Tuesday, September 10 was Mr. Ballard's last morning alive.  At around dawn, three Officer Defendants, including a captain, watched another inmate place a tray of food inside Mr. Ballard's cell.  The Officer Defendants saw that Mr. Ballard had vomited and defecated on himself as his body began to shut down.  The stench emanating from the cell was so overpowering that the inmate delivering food covered his nose with his shirt, and the Officer Defendants backed away from the cell.  The Officer Defendants did not try to help Mr. Ballard or summon medical assistance.

58.     Hour after hour, Mr. Ballard grew still sicker and weaker.  He lay alone on the floor of his cell, covered in excrement.  Shortly before 10:00 a.m., a Medical Defendant—a nurse practitioner—was in the housing area, but she ignored the stench and passed by without stopping to speak with or tend to Mr. Ballard.

59.     Three hours later, shortly before noon, a locksmith who happened to be on the unit looked into Mr. Ballard's cell, and, troubled by what he saw, told the Officer Defendants on duty that he had seen an inmate, lying on the floor of his cell, naked.  The Officer Defendants did nothing.

60.     Hour after hour, throughout the day as Mr. Ballard slowly suffered, Officer Defendants passed by his cell, covering their faces to protect against the foul odor and peering downward to look at him where he lay.  No one entered his cell or called for medical assistance.  At 5:00 p.m. that evening, a Medical Defendant came to Mr. Ballard's tier and spoke with other inmates in nearby cells, but he bypassed Mr. Ballard's cell.

61.     Three and a half hours later, an Officer Defendant looked into the cell and kicked the door several times before walking on.  At 8:43, 9:05, 9:12, 9:42, 9:46, 10:23, 10:25,

10:20, and 10:49 p.m., one Officer Defendant after another looked into the cell, saw Mr. Ballard—naked, filthy, and collapsed—and walked on.

62.     Finally, shortly before 11:00 p.m., medical staff was called to Mr. Ballard's cell.  Defendants Dr. Ahmed Haider and LPN Armel Durandisse responded to the summons.  When they arrived at Mr. Ballard's cell, he was still alive but too weak to move.  He lay naked on a floor scattered with food, feces, vomit, and other filth.

63.     Contrary to sound medical practice and basic humanity, Haider and Durandisse did not rush to Mr. Ballard's aid.  Instead, they hung back, elected not to enter the fetid cell, and instructed two inmates to bring Mr. Ballard out.  The inmates placed Mr. Ballard on a blanket on a gurney and brought him into the corridor.

64.     Haider, Durandisse and the Defendant Officers who were present immediately observed Mr. Ballard's extremely soiled and perilously weak condition.  They also saw that Mr. Ballard's genitals were alarmingly infected.  His penis was denuded.  At some point during his confinement Mr. Ballard had tied a rubber band tightly around his genitals, where it remained, unnoticed and/or ignored by the Officer and Medical Defendants, until his skin had rotted off.

65.     This horrific, excruciating, and ultimately fatal injury was an utterly foreseeable consequence of the neglect and isolation that the Officer and Medical Defendants inflicted on Mr. Ballard, knowing that they would aggravate his tendency toward self-injurious behavior.

66.     Mr. Ballard was clearly on the brink of death, yet he lay neglected on the gurney as the Haider and Durandisse held back, unwilling even to touch his body.  For an

16

inexcusable period, they continued to stand idly by and do nothing.

67.     As the minutes ticked by, Mr. Ballard's heart stopped.  When Dr. Haider finally took action, it was only to place a stethoscope against Mr. Ballard's back and wheel him to the mental health clinic.  Dr. Haider did not resuscitate Mr. Ballard; Durandisse did nothing to save his life.

68.     Had Haider and Durandisse acted swiftly and in accordance with sound medical practice, Mr. Ballard might have survived.

69.     But they did not, and Mr. Ballard was in full cardiac arrest when urgent care physician Frank Flores and an EMT technician arrived at the prison clinic.  Dr. Flores and the EMT technician intubated and briefly resuscitated Mr. Ballard and then transferred him to Elmhurst Hospital Center.  But Mr. Ballard's heart stopped a second time on the way to the hospital.  Doctors at Elmhurst Hospital again revived Mr. Ballard, but only briefly before his heart stopped beating for a third and final time. Mr. Ballard was pronounced dead at 1:31 a.m. on September 11, 2013.

70.     The doctors who treated Mr. Ballard at Elmhurst Hospital diagnosed him with diabetic ketoacidosis—a poisonous buildup of acids in the blood due to lack of insulin, which is a known and easily avoidable complication of diabetes—and general ischemia—a restriction of blood supply sufficiently prolonged to cause cellular death.

71.     On June 3, 2014, following an autopsy, the New York City Office of Chief Medical Examiner ("the Medical Examiner") declared Mr. Ballard's death a homicide.

72.     Mr. Ballard experienced extreme pain and suffering, emotional distress, and death as a result of defendants' misconduct, including but not limited to their cruel and

unusual treatment of Mr. Ballard, their deliberate indifference to his medical needs, and their medical malpractice.

**A Custom, Policy, and Practice of Abuse and Neglect**

73.     For decades before Mr. Ballard's death, DOC, DOHMH/CHS, and Corizon were aware of the routine, dangerous, and unconstitutionally deliberate indifference by corrections officers and medical providers in the City's jails to the medical and mental health of inmates with serious mental illnesses—the same indifference that ultimately took Mr. Ballard's life.

74.     Since at least the early1980s, the New York City Board of Corrections ("BOC"), DOC, and DOHMH/CHS have recognized that inmates suffering from mental illness are particularly vulnerable in City jails, and that correctional and medical staff who are not specially trained and monitored will place such inmates at serious risk.

75.     Accordingly, in 1985, the City adopted Mental Health Minimum Standards for the City jails, which established minimum standards for, among other things, the mental health training of correctional and medical staff, the provision of medical and mental health services to inmates, and the design of housing areas to minimize inmates' distress and self-injurious behaviors.

76.     DOC, DOHMH/CHS, Corizon, and the Senior Defendants persistently and knowingly failed to ensure that these standards were satisfied, even though they understood them to be essential for protecting the basic rights and safety of one of Rikers Island's most vulnerable populations.

77.     DOC, DOHMH/CHS, Corizon and the Senior Defendants have consistently

18

failed to staff Rikers Island's mental health units with steady, adequately trained correction

officers and mental health professionals.  They have also permitted and arranged for

overcrowding of Rikers Island's mental health units, including unit C-71, despite knowing that

overcrowded and unduly stressful environments present serious risk of injury to mentally ill

inmates.

78.     On information and belief, prior to Mr. Ballard's death, an accrediting

organization based in San Francisco visited Rikers Island's mental health units and reported to

DOC and DOHMH/CHS that the physical plant was one of the worst it had ever seen for

management and treatment of mentally ill inmates.

79.     DOC, DOHMH/CHS, and the Senior Defendants have also tolerated and

encouraged the excessive and profoundly destabilizing use of punitive segregation of the type that

Mr. Ballard endured, even as they recognized the grave dangers of such a practice.  According to

data collected by DOHMH, and known to the City and the Senior Defendants at the time of Mr.

Ballard's ordeal, from 2007 through 2012 the number of self-inflicted mutilations and suicide

attempts by Rikers inmates increased by more than 75% as the number of prisoners in punitive

segregation increased by 70%.

80.     In the years and months leading up to Mr. Ballard's death, the City,

Corizon, and the Senior Defendants were acutely aware of the rampant abuse and neglect of

inmates at Rikers Island who, like Mr. Ballard, suffered from serious mental illnesses.

81.     In the summer of 2013, DOC, DOHMH/CHS, and the Senior Defendants

collected and reviewed extensive materials concerning punitive segregation of mentally ill

inmates, mental health training for correction officers, and injury to and self-harm by mentally ill

inmates.  They also commissioned and studied a detailed analysis by two professors of

psychology concerning the treatment of mentally ill inmates at Rikers Island.  During this time,

DOC, DOHMH/CHS, and BOC administrators, including Commissioner Schiro, made multiple

visits to the Rikers Island mental health units, including unit C-71 at AMKC, to observe the

treatment of mentally ill inmates at the jail.  *See* New York City Board of Correction, *Motion to*

*proceed with rule making regarding punitive segregation on Rikers Island*, Aug. 22, 2013,

*available at* http://www.nyc.gov/html/boc/downloads/pdf/Memo%20to%20the%20Board%20%

2008222013.pdf.

        82.    This review confirmed what the City, Corizon, and Senior Defendants

already knew: that correction and medical staff were not adequately trained to avoid dangerous

and self-injurious behaviors by mentally ill inmates; that punitive segregation of mentally ill

inmates was a dangerous and counterproductive yet rampant practice; that correction officers

routinely responded to even the slightest perceived acts of disrespect with unjustified physical

force and punishment, including solitary confinement; that mental health staff were not providing

adequate services to inmates who were segregated; and that the environment in which mentally ill

inmates was unnecessarily and excessively stressful, exacerbating their symptoms and increasing

the likelihood of violence and self-harm.  In sum, by the time that Mr. Ballard was cruelly and

unlawfully confined and eventually killed for having danced in a way that offended an officer, the

City, Corizon, and the Senior Defendants were acutely aware that correctional and medical and

mental health personnel at Rikers Island's mental health units, including C-71, were inadequately

trained and were systematically violating the Mental Health Minimum Standards.  They also

knew that such conditions were exacerbating inmates' mental illnesses and causing them serious

harm.  *See* Drs. James Gilligan & Bandy Lee, *Report to the New York City Board of Correction*,

Sept. 5, 2013, *available at* http://solitarywatch.com/wp-content/uploads/2013/11/Gilligan-Report.-Final.pdf.

83.     Mr. Ballard's death was just one in a series of horrific episodes that have made tragically clear the consequences of DOC's, DOHMH/CHS's, and Corizon's systematic failure to ensure either adequate access to medical care for Rikers inmates suffering from mental illness or sufficient training for those responsible for the inmates' well-being.

84.     Approximately one year before Mr. Ballard died, on August 18, 2012, the City, Corizon, and Senior Defendants witnessed the gruesome death of Jason Echevaria, which similarly resulted from the deliberate indifference of Rikers Island correction officers.  Mr. Echevarria was known to suffer from bipolar disorder and was held at a mental health observation unit at Rikers Island following multiple suicide attempts.  Mr. Echevarria swallowed a packet of undiluted highly toxic detergent, which was improperly given to him by a correction officer.  Mr. Echevarria began vomiting, and for several hours he banged on his cell door, shouting in pain and screaming for help.  The guards and supervisors responsible for Mr. Echevarria's safety made a deliberate decision not to summon medical assistance, and he slowly suffered to death inside his cell.  The Medical Examiner declared Mr. Echevarria's death a homicide, resulting from "neglect and denial of medical care."

85.     The pattern of deliberate neglect of inmates on Rikers Island's mental health units has continued to have appalling consequences even after the death of Mr. Ballard.  For example, on February 15, 2014, Jerome Murdough, another inmate suffering from mental illness, baked to death in a Rikers Island cell.  Mr. Murdough's psychotropic medication made him particularly susceptible to heat, but he was locked inside a cell that was over 100 degrees.

Correction officers were supposed to check on Mr. Murdough every 15 minutes, but he was left alone for about four hours by an officer who had a history of abandoning her post. By the time an officer finally visited Mr. Murdough's cell, he had died.

86.     Mr. Echiavarra's death in August 2012 alerted the City, Corizon, and the Senior Defendants to the dire ramifications of their customary disregard for the training, staffing, and other basic requirements reflected in the Mental Health Minimum Standards, which they knew to be essential for the physical and mental welfare of mentally ill inmates. But in September 2013, the City, Corizon, and the Senior Defendants were still not taking even the most elemental precautions to protect inmates from harm.

87.     From the afternoon of September 3 (the day before Mr. Ballard was put in solitary confinement) through the night of September 10 (when he was finally removed from his cell and taken to the clinic), 53 officers worked in his housing area in AMKC mental health unit C-71. Not one of them had received the mental health training that City regulations require for officers assigned to a mental health unit.

88.     In addition, while the Mental Health Minimum Standards requires that only regularly assigned, or "steady," correction officers work on mental health units, only one of the 53 officers—and none of the 11 captains—who worked on unit C-71 between September 3 and September 10 was regularly assigned to the post.

89.     Furthermore, in September 2013, when Mr. Ballard was living on unit C-71, its inmate population was at approximately 120% maximum capacity.

90.     These are but several examples of the City's and the Senior Defendants' failures to take sufficient measures to curb the abuse and neglect that is directed daily toward

inmates of the Rikers Island mental health units.  The City and Senior Defendants have allowed

that abuse and neglect to persist through inadequate training, oversight, and discipline.

91.     The City, Corizon, and the Senior Defendants knew that their failure to

train and oversee the correction officers and medical and mental health providers working on

AMKC unit C-71 could cause the mental and physical degeneration, and even death, of unstable

and vulnerable inmates.  They disregarded this serious risk to the health and safety of those in

their care, and as a result, Mr. Ballard was needlessly killed at the age of 39.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against All Defendants)

92.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were

fully set forth at length herein.

93.     By reason of the foregoing, and by confining Mr. Ballard to his cell,

denying him access to adequate medical and mental health care, failing to provide medical and

mental health treatment, and/or exhibiting deliberate indifference to Mr. Ballard's rights by not

acting on information which indicated that unconstitutional acts were occurring, the Officer and

Medical Defendants deprived Mr. Ballard of rights, privileges, and immunities guaranteed to

every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to,

rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments of the United States

Constitution.  The Officer and Medical Defendants acted at all relevant times hereto willfully,

wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a

conscious indifference to the clear risk of death or serious injury to Mr. Ballard that shocks the

conscience.  As a direct and proximate result of these violations of Mr. Ballard's constitutional

rights, he suffered the damages hereinbefore alleged.

94.     The Senior Defendants knew that the pattern of abuse and neglect against mentally ill inmates described above existed on the Rikers Island mental health units prior to and including the time of Mr. Ballard's mistreatment and death.  They created or allowed the continuance of the custom under which mentally ill inmates were illegally and excessively placed in solitary confinement and deprived of adequate medical care.  Their failure to take measures to curb this pattern of abuse and neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Ballard.  The Senior Defendants' conduct was a substantial factor in the continuation of such abuse and neglect and a proximate cause of the constitutional violations alleged in this complaint and of Mr. Ballard's resultant damages, hereinbefore alleged.

95.     The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as DOC and/or DOHMH/CHS officers, agents, employees, and/or contracted personnel.  Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  Said Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Ballard of his constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

96.     Defendants City, through DOC and DOHMH/CHS, and Corizon, through its officers and employees, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to a pattern and practice of abuse and neglect at Rikers Island's mental health units by DOC and DOHMH/CHS officers, employees, agents, and contracted

24

personnel at the time of Mr. Ballard's mistreatment and homicide.  This widespread tolerance of abuse and neglect constituted municipal and corporate policy, practice, and custom, and was a proximate cause of Mr. Ballard's mistreatment and homicide, and plaintiff's resultant damages, hereinbefore alleged.

97.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom pursuing to which Mr. Ballard was abused, neglected, and killed, the City and Corizon have deprived Mr. Ballard of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

98.     As a direct and proximate result of the misconduct and abuses of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM FOR RELIEF
### Medical Malpractice
### (Against the Medical Defendants and Corizon)

99.     The Medical Defendants and defendant Corizon were employed, retained and/or contracted with by the City to provide medical and mental health care to all inmates in the care and custody of the City at Rikers Island, including Mr. Ballard.  The Medical Defendants and Corizon agreed and purported to provide medical care and services to inmates in at Rikers Island, including Mr. Ballard, from September 4, 2013 until September 11, 2013.

100.     The Medical Defendants and Corizon held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of Rikers Island inmates, including Mr. Ballard.

101.    The Medical defendants and Corizon were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Ballard.

102.    Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

103.    As a result of defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Ballard sustained the damages hereinbefore alleged.

104.    A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed hereto.

### THIRD CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**
**(Against the Officer Defendants, the Medical Defendants, and Corizon)**

105.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

106.    Defendants engaged in extreme and outrageous conduct intentionally and recklessly causing severe emotional distress to Mr. Ballard.

107.    By reason of the foregoing, defendants are liable to plaintiff for the intentional infliction of emotional distress.

108.    Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress suffered by Mr. Ballard. Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

109.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## FOURTH CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress**
**(Against the Individual Defendants and Corizon)**

110.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

111.    By reason of the foregoing, defendants are liable to Ms. Griffin, both in her capacity as administratrix and in her individual capacity, for the negligent infliction of emotional distress.

112.    Defendants and their officers, agents, servants, and employees were responsible for this negligent infliction of emotional distress.  Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

113.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM FOR RELIEF
**Negligent Hiring/Training/Retention of**
**Employment Services**
**(Against Corizon)**

114.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

115.    Defendant Corizon owed a duty of care to Mr. Ballard to prevent the

conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Mr. Ballard or to those in a like situation would probably result from the foregoing conduct.

116.    Upon information and belief, all of the Medical Defendants were unfit and incompetent for their positions.

117.    Corizon knew or should have known through the exercise of reasonable diligence that the Medical Defendants that it employed were potentially dangerous. Corizon's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused plaintiff's injuries.

118.    As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

### SIXTH CLAIM FOR RELIEF
**Wrongful Death**
**(Against the Individual Defendants and Corizon)**

119.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

120.    By reason of the foregoing, the statutory distributees of Mr. Ballard's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Ballard.  Defendants are liable for the wrongful death of Mr. Ballard.

121.    As a consequence, plaintiff has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

**Negligence**
**(Against the Individual Defendants and Corizon)**

122.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

123.     Defendants owed a duty of care to Mr. Ballard as an inmate at Rikers Island.

124.     Defendants breached the duty of care that they owed to Mr. Ballard by confining him to his cell, denying him access to adequate medical and mental health care, failing to provide medical and mental health treatment, and/or otherwise neglecting his medical and mental health needs.

125.     Defendants' breach of their duty of care was the proximate cause of Mr. Ballard's serious and unnecessary injuries, including severe pain and suffering and death.

126.     Defendant Corizon, as employer of all or some of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

127.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM FOR RELIEF

**New York State Constitution, Art. I § 12**
**(Against the Individual Defendants and Corizon)**

128.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

129.     By reason of the foregoing, by denying Mr. Ballard adequate medical care

29

and killing him, defendants deprived him of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I § 12 of the New York Constitution.

130.    Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as City and/or DOC and/or DOHMH/CHS officers, agents, or employees.  Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Ballard of his constitutional rights secured by Article I § 12 of the New York Constitution.

131.    Defendants, their officers, agents, servants, and employees were responsible for the deprivation of Mr. Ballard's state constitutional rights.

132.    Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

133.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff respectfully requests judgment against defendants as follows:

1.    awarding compensatory damages in an amount to be determined at trial;

2.    awarding punitive damages against the Individual Defendants in an amount to be determined at trial;

3.    awarding plaintiff reasonable attorneys' fees and costs under 42 U.S.C. §

1988; and

    4.    directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: September 10, 2014
       New York, New York

                    EMERY CELLI BRINCKERHOFF
                    & ABADY LLP

                    Jonathan S. Abady
                    Hayley Horowitz
                    600 Fifth Avenue, 10th Floor
                    New York, New York 10020
                    (212) 763-5000

                    THE LEGAL AID SOCIETY
                    Jonathan S. Chasan
                    Mary Lynne Werlwas
                    199 Water Street, 6th Floor
                    New York, New York 10038
                    (212) 577-3530

                    *Attorneys for Plaintiff Beverly Ann Griffin*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
BEVERLY ANN GRIFFIN, individually
and as Administratrix of the Estate          NO: 14 Civ. _____
of her son, Bradley Ballard

                                             **CERTIFICATE OF MERIT**

                        Plaintiff,

           -against-

CITY OF NEW YORK, et al.,

                        Defendants.
---------------------------------------X

        HAYLEY HOROWITZ, an attorney duly admitted to practice law

before the Courts of the State of New York, hereby affirms,

pursuant to CPLR Section 2106:

        1.   I am a member of the firm of EMERY CELLI BRINCKERHOFF &

ABADY LLP.

        2.   I have reviewed the facts of this case and have

consulted with at least one physician who is licensed to practice

in this State, or any other State, and I reasonably believe that

said physician is knowledgeable as to the relevant issues involved

in this particular action, and I have concluded on the basis of

such review and consultation that there is a reasonable basis for

the commencement of this action.

Dated: New York, New York
        August 29, 2014