UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BEVERLY ANN GRIFFIN, individually and as Adminstratrix of the Estate of her son, Bradley Ballard,

Plaintiff,

– against –

The CITY OF NEW YORK; Former Commissioner DORA B. SCHRIRO; Chief of Department EVELYN MIRABAL; Warden ROSE AGRO; CORIZON HEALTH, Inc.; Dr. AHMED HAIDER; Dr. NAGEH GARAS; Dr. YUGUNDO PARK; LAURA VAN WYK; ARMEL DURANDISSE; Dr. LAALI ALI; FROILAN SUAREZ; REAGAN ANUSIONWU, Dr. AYODELE GREEN, EMMANUEL CHARLES; PHILIP WITTINGHAM; Captain TIMOTHY JOHNSON, Shield No. 1065; Deputy Warden JOHN GALLAGHER, Shield No. 581; Captain ARNOLD MARSHALL, Shield No. 1618; Officer ALEXANDER McDONALD, Shield No. 12019; Officer JHULIAN NEWELL-LITTLE, Shield No. 3160; Captain DARRONN FREDERICK, Shield No. 1387; Assistant Deputy Warden ANDOURE GRANT, Shield No. 1330; Assistant Deputy Warden ELAINE BARRETT, Shield No. 23; Warden TURHAN GUMUSDERE, Shield No. 356; Assistant Deputy Warden MICHELLE HALLETT, Shield No. 700, and JANE/JOHN DOES ## 1-18,

Defendants.

---

14 Civ. 7329 (NRB)

**SECOND AMENDED COMPLAINT AND <u>JURY DEMAND</u>**

**ECF CASE**

---

## <u>PRELIMINARY STATEMENT</u>

1.      This is a civil rights action brought by Plaintiff Beverly Ann Griffin, individually and as Adminstratrix of the Estate of her son, Bradley Ballard, who was killed in 2013 by correction officers and medical and mental health providers on Rikers Island.  The level of abuse, indifference, and misconduct at the heart of this case is stunning and unconscionable.

Over a seven day period, Bradley Ballard was subjected to mistreatment so extreme that it was the functional equivalent of torture and medical care so indifferent that it "shocked the conscience" of the New York State Commission of Correction Medical Review Board ("SCOC").

2.      The precipitating event giving rise to Mr. Ballard's death was an entirely innocent act by a clearly mentally ill patient-inmate.  In September 2013, Mr. Ballard, who suffered from diabetes and schizophrenia, was locked inside his cell on a mental health unit for seven straight days as punishment for dancing in a way that caused offense to a female officer. During that time period, he was denied access to the medication, water, and medical care that he needed to survive.  Although medical and mental health personnel were required to visit Mr. Ballard twice a day, not a single nurse, doctor or other medical or mental health provider entered his cell during his seven days of confinement and the medicine he was supposed to take twice daily to control his diabetes and schizophrenia was withheld from and not otherwise administered to him.  Rather than provide the critical care required, corrections officers and medical staff, who knew that Mr. Ballard could not survive without medication, essentially stood by and watched as Mr. Ballard languished, deteriorated, and ultimately died.

3.      The number of times correctional staff, medical personal and other staff passed by Mr. Ballard's cell while he was in dire circumstances during these seven days—doing nothing to assist or aid him—shocks the conscience.

4.      By the sixth day of his confinement, it was clear that Mr. Ballard had grown so weak, he could not stand.  Unable to endure the stress of his situation, and with his schizophrenia unmedicated, Mr. Ballard engaged in self-mutilation, taking off all of his clothes and tying a rubber band tightly around his genitals.  As Mr. Ballard's body further deteriorated, he

also defecated and vomited on himself.  Still, no one entered Mr. Ballard's cell to relieve his suffering.  Hour after hour, throughout the afternoon and evening of September 10, correction officers peered through the window of Mr. Ballard's cell to see him lying on the floor, filthy, naked, and suffering. Instead of making the obviously necessary interventions, multiple staff members inexplicably watched this man suffer, then walked away.

5.      Finally, on September 10, 2013, as midnight approached, medical staff was summoned to the area.  But rather than providing the emergency assistance Mr. Ballard desperately needed, correction officers and medical staff who could have saved his life once again failed to act, unwilling even to touch Mr. Ballard's body, which was covered with feces and vomit.  The rubber band tied around his genitals had cut off circulation for so long that Mr. Ballard's penis had become grossly infected, its skin eroded off.

6.      As a doctor and two nurses stood by, Mr. Ballard's heart stopped beating. Mr. Ballard was eventually taken to Elmhurst Hospital Center, but belated efforts to save his life failed.  In the early morning hours of September 11, 2013, Mr. Ballard died from the stress of his seven-day ordeal.  The causes of death included ketoacidosis—a poisonous buildup of acids in the blood due to lack of insulin, which his diabetes medication would have prevented—and sepsis. On June 3, 2014, the New York City Office of Chief Medical Examiner declared Mr. Ballard's death a homicide.

7.      New York City and its senior officials are, and have been, aware that the mental health units at Rikers Island are staffed with insufficiently trained correction officers and medical and mental health personnel, who routinely abuse and deliberately disregard the medical needs of mentally ill inmates.  Staff members persistently and improperly use solitary

confinement to punish mentally ill inmates, thus aggravating their problematic and self-injurious behaviors, and regularly deny inmates access to needed medical care.  New York City and its senior officials have consistently, for years, failed to take meaningful and effective steps to curb the systematic brutality and deliberate indifference that plague Rikers Island's mental health units. The incidents involving Mr. Ballard are part of a pattern of incidents of similar inhumane and illegal treatment of mentally ill inmates by Rikers Island correction officers and medical and mental health providers, and it is neither the first nor the last such incident that resulted in death. In fact, these failures and abhorrent practices are now the object of both substantial media attention and government investigation.

8.     Mr. Ballard's suffering and ultimate death also resulted from Corizon Health, Inc.'s nationwide pattern of mistreating inmates in its care.  Corizon was the for-profit provider of medical care on Rikers Island at the time of Mr. Ballard's death.  Corizon's corporate policy of providing inmates deficient care is so deplorable that prison system after prison system has cancelled Corizon's contracts in recent years—Maine, Maryland, Minnesota, Pennsylvania, and Tennessee are only some of the localities that have said "enough is enough."  Indeed, the Eleventh Circuit upheld a jury's determination that Corizon's corporate policy is to delay necessary care in order to cut costs and increase Corizon's profits.  *See Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 184-85 (11th Cir. 2012).  New York City—which, at the time of Mr. Ballard's death, knew or should have known of Corizon's deadly policy of deliberate indifference—finally announced in June 2015 that it would cancel Corizon's contract in City jails, but that was too late to save Mr. Ballard from Corizon's pattern of abuse.  By then, nearly two years had passed since Mr. Ballard was killed by what the New York State Commission of

4

Correction ("SCOC") deemed Corizon's "flagrantly inadequate, substandard and dangerous medical and mental health care to Bradley Ballard."

9.      Defendants' actions were contrary to law, contrary to sound medical practice, and contrary to the norms of a civilized society.  This complaint, arising from these tragic, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to applicable state and federal civil rights law.

## PARTIES

10.      Bradley Ballard was a citizen of the United States and resided at Rikers Island jail in Bronx County at the time these events occurred.  At the time of his September 11, 2013 homicide, Mr. Ballard was detained at the Anna M. Kross Center ("AMKC") at Rikers Island.

11.      Beverly Ann Griffin is Mr. Ballard's mother and was duly appointed the adminsitratrix of his estate on September 2, 2014.

12.      Defendant City of New York ("the City") is a municipal corporation that, through the Department of Correction ("DOC"), operates a number of detention jails. Correctional Health Services ("CHS") is a unit that is currently within the New York City Health and Hospitals Corporation ("HHC"), and at the time of Mr. Ballard's death was within the New York City Department of Health and Mental Hygiene ("DOHMH"), a City agency.  CHS and its parent agency are responsible for the provision of medical and mental health care and services to prisoners confined in the City jails, including AMKC.  CHS contracted with Corizon Health, Inc., a private corporation, to provide such care and services.  DOC and CHS, through their senior officials at the central office and in each jail facility, promulgate and implement policies,

including those with respect to the provision of medical and mental health care, and access to medical and mental health and other program services mandated by local law and court orders. DOC additionally promulgates and implements policies with respect to the use of solitary confinement and the isolation of mentally ill inmates.  In addition, senior officials in both DOC and CHS and its parent agency are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC and CHS policies or customs.  DOC and CHS are also responsible for the appointment, training, supervision, and conduct of all DOC and CHS clinical personnel, including the defendants referenced herein.

13.     On information and belief, at all times relevant hereto, defendant Corizon Health, Inc. ("Corizon") provided medical and mental health services to prisoners in DOC correctional facilities, including AMKC.  In carrying out its duties, Corizon was required to ensure that the personnel it employed at AMKC complied with all DOC and CHS policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes, and regulations.

14.     At all times relevant hereto, defendant Dora B. Schriro was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of her employment as such, and acting under color of state law.  On information and belief, Schriro, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.  As Commissioner, Schriro was also responsible for the care, custody, and control of all

inmates housed in the Department's jails.  In addition, at all relevant times, Schriro was

responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws

of the United States and of the State of New York.  Defendant Schriro is sued in her individual

capacity.

15.     At all times relevant hereto defendant Evelyn Mirabal was the Chief of

Department of DOC, acting in the capacity of agent, servant, and employee of defendant City,

within the scope of her employment as such, and acting under color of state law.  As Chief of

Department, she was the highest-ranking uniformed member of the department, and was

responsible for the supervision, oversight, and discipline of the uniformed security staff in all the

DOC jails.  She was also responsible for the care, custody, and control of all inmates in the DOC

jails.  Defendant Mirabal is sued in her individual capacity.

16.     At all times relevant hereto, defendant Rose Agro was the Warden of

AMKC within DOC, acting in the capacity of agent, servant, and employee of defendant City,

within the scope of her employment as such, and acting under color of state law.  As Warden, her

responsibilities included the care, custody, and control of all inmates, as well as the supervision of

all staff, in AMKC.  Defendant Agro is sued in her individual capacity.

17.     Defendants Schriro, Mirabal, and Agro (collectively "the Senior

Defendants") were, at all times relevant hereto, senior officials who exercised policymaking,

supervisory, and disciplinary authority on behalf DOC.

18.     On information and belief, at all times relevant hereto, defendant Dr.

Ahmed Haider was a physician employed by Corizon and assigned to Rikers Island between June

18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

19.     On information and belief, at all times relevant hereto, defendant Dr. Nageh Garas was a physician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

20.     On information and belief, at all times relevant hereto, defendant Dr. Yugundo Park was a physician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

21.     On information and belief, at all times relevant hereto, defendant Laura Van Wyk, was a social worker employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  She was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

22.     On information and belief, at all times relevant hereto, defendant Armel Durandisse was a nurse practitioner employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  She was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

23.     On information and belief, at all times relevant hereto, defendant Dr. Laali Ali was a physician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  She was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

24.    On information and belief, at all times relevant hereto, Froilan Suarez was a physician assistant employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

25.    On information and belief, at all times relevant hereto, Reagan Anusionwu was a nurse practitioner employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

26.    On information and belief, at all times relevant hereto, Dr. Ayodele Green was a physician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

27.    On information and belief, at all times relevant hereto, Dr. Emmanuel Charles was a mental health clinician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

28.    On information and belief, at all times relevant hereto, Dr. Philip Wittingham was a mental health clinician employed by Corizon and assigned to Rikers Island between June 18, 2013 and September 11, 2013.  He was responsible for the provision of appropriate medical and mental health care to patients at Rikers Island, including Mr. Ballard.

29.    On information and belief, at all times relevant hereto, defendants Jane/John Doe ## 1-18, Haider, Garas, Park, Van Wyk, Durandisse, Ali, Suarez, Anusionwu,

Green, Charles, and Wittingham ("the Medical Defendants") were physicians, physician's assistants, social workers, mental health clinicians, and other medical and mental health providers, employed by Corizon between June 18, 2013 and September 11, 2013, who were responsible for the medical and mental health care of inmates on AMKC unit C-71 on those dates and/or participated in, and/or had knowledge of and failed to intervene in, the denial of adequate medical care to Mr. Ballard that took place on those dates. Their duties included but were not limited to caring for all patients in their assigned areas at Rikers Island, which included but was not limited to cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers at Rikers Island, direct oversight and supervision of nursing staff, and/or provision of emergency medical care. At all relevant times hereto, the Medical Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, and/or contracted personnel of defendant City. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of City jails, including DOC and CHS policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. The Medical Defendants are sued in their individual capacities.

30.     On information and belief, at all times relevant hereto, Captain Timothy Johnson was a captain in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

10

31.     On information and belief, at all times relevant hereto, Deputy Warden John Gallagher was an assistant deputy warden in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

32.     On information and belief, at all times relevant hereto, Captain Arnold Marshall was a captain in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

33.     On information and belief, at all times relevant hereto, Correction Officer Alexander McDonald was a correction officer in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

34.     On information and belief, at all times relevant hereto, Correction Officer Jhulian Newell-Little was a correction officer in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

35.     On information and belief, at all times relevant hereto, Captain Darron Frederick was a captain in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

36.     On information and belief, at all times relevant hereto, Assistant Deputy Warden Andoure Grant was an assistant deputy warden in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

37.     On information and belief, at all times relevant hereto, Assistant Deputy Warden Elaine Barrett was an assistant deputy warden in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

11

38.     On information and belief, at all times relevant hereto, Warden Turhan Gumusdere was a deputy warden in the DOC assigned to AMKC between September 9, 2013 and September 11, 2013.

39.     On information and belief, at all times relevant hereto, Assistant Deputy Warden Michelle Hallett was an assistant deputy warden in the DOC assigned to AMKC between September 4, 2013 and September 11, 2013.

40.     At all times relevant hereto, defendants Johnson, Gallagher, Marshall, McDonald, Newell-Little, Frederick, Grant, Barrett, Carrillo, Gumusdere, and Hallett ("the Officer Defendants") were officers of DOC, who participated in and/or had knowledge of and failed to intervene in the lock-in and solitary confinement of and denial of adequate medical care to Mr. Ballard on those dates.  At all times relevant hereto, the Officer Defendants were acting under color of state law and within the scope of their capacities as agents, servants, and employees of defendant City.  The Officer Defendants are sued in their individual capacities.

41.     The Senior Defendants, Officer Defendants, and Medical Defendants are referred to collectively herein as "the Individual Defendants."

42.     Defendants Jane/John Does # 1-18 are sued under fictitious designations because plaintiff has not been able to ascertain their names and, where relevant, shield numbers, notwithstanding reasonable efforts to do so.

## JURISDICTION AND VENUE

43.     This action arises under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and New York state common law and constitution.

44.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

45.     The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

46.     Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

**The Mistreatment and Homicide of Mr. Ballard**

47.     On June 13, 2013, Bradley Ballard was admitted to DOC custody on a parole violation for failure to report a change of address. For seventeen days, Mr. Ballard was housed in the general population at Rikers Island.

48.     At the time of his arrest, Mr. Ballard was 39 years old.  He suffered from diabetes and schizophrenia, and while incarcerated he demonstrated delusional and paranoid behavior.

49.     Mr. Ballard was therefore in obvious need of specialized medical and psychiatric treatment.  Nonetheless, from the moment he arrived in DOC custody, Mr. Ballard's most basic medical and mental health needs were ignored.  After Mr. Ballard arrived at Rikers Island on June 18, 2013, he was required to be seen twice daily for insulin finger sticks and blood glucose readings, but over the next two weeks, he received only eight of his twenty-six prescribed treatments.

13

50.     On July 1, 2013, Mr. Ballard was taken to Bellevue Hospital for a psychiatric evaluation. There, Mr. Ballard's diagnoses of schizophrenia and diabetes were confirmed, and he was prescribed a continued regimen of Metformin and insulin for his diabetes and a new assortment of antipsychotic drugs for his schizophrenia.  He was admitted to the hospital and remained at its psychiatric prison ward for 38 days.

51.     After Mr. Ballard's discharge from Bellevue Hospital on August 7, 2013, he returned to Rikers Island, where he underwent a psychiatric assessment.  Mr. Ballard was again found to be suffering from psychosis.  Mr. Ballard's CHS records were updated to reflect this determination and to note his longstanding history of chronic mental illness, self-harm, and suicide attempts.  The records also reflected that Mr. Ballard was resistant to taking psychiatric medication and therefore needed to be observed closely.  At the direction of a CHS supervising psychiatrist, Mr. Ballard was transferred to Anna M. Kross Center ("AMKC") unit C-71, a mental health unit, so that he might be able to receive a higher level of care than available to inmates in the general population.

52.     Although Mr. Ballard's records clearly indicated that his physical and mental well-being required careful monitoring and medication, the Medical Defendants failed to provide him obviously necessary medical care upon his return to jail from Bellevue Hospital.

53.     Corizon and its employees continued failing to provide Mr. Ballard with the vast majority of his blood glucose readings and insulin treatments, missing 48 out of 50 appointments between August 7 and September 5; Mr. Ballard was not given a fasting glucose test that was ordered for him on August 7; and he was not seen for scheduled diabetes care clinics on August 14, 20, or 22.  None of these missed treatments and visits was explained in Mr.

14

Ballard's chart, but, as DOHMH later concluded, some if not all of them were attributable to insufficient available slots at the clinics due to Corizon's failure to assign enough staff to treat patients.

54.     When Mr. Ballard was finally seen in the clinic by Dr. Laali Ali on August 26, she treated him for a benign complaint about dry skin, but because Dr. Ali never reviewed Mr. Ballard's chart, she failed to notice that he had missed his previous three clinic dates or that his insulin order was set to expire that day.  Dr. Ali did not renew the insulin order.  Her failure to renew Mr. Ballard's insulin meant that, beginning the next day, he would have no more access to the basic treatment he needed to keep him alive.  Sixteen days later, Mr. Ballard died from lack of insulin.  Following Dr. Ali's shockingly incompetent consultation, Mr. Ballard continued to miss clinical follow-up appointments, despite his chronic and life-threatening diabetes, with no medical staff meeting his need for insulin, without which he would—and did—die.

55.     Corizon was equally deliberately indifferent to Mr. Ballard's serious mental health needs as to his medical needs.  On August 15, Mr. Ballard reported to a Corizon nurse practitioner, Reagan Anusionwu, that his psychiatric medication was working well and without any side effects.  Nonetheless, Nurse Anusionwu ordered Ballard to switch to an ineffectively low dose of a different medication, Seroquel, which had explicitly been disapproved for Mr. Ballard by a Corizon doctor, David Rosenberg, less than a week before.  This disapproval had been noted by Dr. Rosenberg in Mr. Ballard's chart, but Nurse Anusionwu did not consult Mr. Ballard's chart, and he offered no rationale for exchanging a psychotropic medication that was working for one that had been disapproved by a doctor.  Nor did Nurse Anusionwu schedule any follow-up appointments for re-evaluation or titration, despite having started Mr. Ballard on a new medication.

15

56.   Following Nurse Anusionwu's inexplicable decision to change Mr. Ballard's medication, Mr. Ballard's psychiatric condition steadily worsened.  He suffered from a marked increase in the symptoms of his illness, including agitation, paranoia, and self-harm.

57.   Approximately two weeks after Mr. Ballard began to take Seroquel, on August 28, he was visited in his cell by defendant LMSW Laura Van Wyk, who found him agitated, demanding to be let out of his cell, and insisting, although he was not married, that his wife worked in the building.  Although recognizing Mr. Ballard to be in psychiatric distress, Van Wyk did not refer him to a psychiatrist.  The following day, at a court appearance, Mr. Ballard so concerned his attorneys with his paranoid and persecutory delusions that they contacted Corizon suggesting that he might need to be re-hospitalized.  A physician assistant, Froilan Suarez, visited Mr. Ballard and found him irritable and paranoid.  Suarez referred Mr. Ballard to a mental health clinic the following morning; the referral was ignored.

58.   Several days later, on September 1, 2013, Mr. Ballard was seen by Dr. Ayodele Green because he had injured himself by banging his head on his cell wall and had declared that he would continue hurting himself until he saw a mental health provider.  Despite Mr. Ballard's continued distress, Dr. Green kept him on the same too-low dosage of Seroqel.  Dr. Green was not the only mental health provider who remained indifferent to the obvious indications that Mr. Ballard's medication was not effective.  At no point did any Medical Defendant conduct a clinical review or assessment of the efficacy of Mr. Ballard's psychiatric medication, despite his changed behavior following the switch to a medication that had not been authorized—and in fact had been disapproved—by a physician, and was, moreover, being offered to Mr. Ballard at an ineffectively low dosage.

16

59.     On September 3, in light of his psychological distress, Mr. Ballard was transferred to AMKC's Quad Lower 4 in unit C-17, a mental health observation housing area.

60.     DOC policy required that Mr. Ballard be permitted to spend 14 hours each day outside of his cell while housed on unit C-17.  In accordance with this policy, Mr. Ballard was locked out of his cell at approximately 8:30 a.m. on Wednesday, September 4, 2013.

61.     At approximately 2:00 p.m. that afternoon, while standing in a common area, Mr. Ballard began to dance, turning in circles.  He took off his shirt, twisted it up in his hands, and thrust it up and down as he danced.

62.     Not recognizing or not caring that Mr. Ballard's dance was a manifestation of his mental illness, a female correction officer took offense at the phallic shape of Mr. Ballard's rolled up shirt and the sexual nature of his movements.  To punish Mr. Ballard for his perceived disrespect, Captain Mohamed Shanu ordered that Mr. Ballard be locked inside his cell as punishment.  Officers Kalim Odom and Arthur Beauflis forced Mr. Ballard back into his cell, even though he should have been permitted to remain outside the cell for the rest of the afternoon.

63.     From approximately 2:50 pm on Wednesday, September 4 until approximately 11 p.m. on Tuesday, September 10, Mr. Ballard remained locked inside his cell by the Officer Defendants, who wanted to teach him a lesson for the offense that his dance had caused.  Throughout that nearly seven-day period, Mr. Ballard was not once permitted to leave his cell, and the Officer Defendants and Medical Defendants responsible for his care denied him access to clean water, medication, medical and mental health treatment, exercise, or a shower.

64.     Mr. Ballard was confined to his cell without any legal authority and indeed contrary to DOC rules and regulations, and was never offered an opportunity to contest his unauthorized lock-in and the attendant deprivations of liberty.

65.     The Officer and Medical Defendants were or should have been aware of Mr. Ballard's mental illness and his history of self-harm.  Indeed, Mr. Ballard's CHS records indicated that as recently as September 2, 2013, he had been treated for self-inflicted lacerations and scratches to his head and forearms.

66.     The Officer and Medical Defendants also were or should have been aware of solitary confinement's propensity to exacerbate the most dangerous symptoms of mental illness, including self-mutilation.

67.     Because of the extreme vulnerability of individuals with mental illnesses to the pathogenic effects of solitary confinement, City regulations require that an individual like Mr. Ballard, who is being treated for mental disorders, be placed in seclusion only for therapeutic, and never for punitive, reasons, and only at the direction of a psychiatrist.

68.     City regulations further require that such an individual who is held in seclusion be kept under constant observation, reviewed and documented in writing by nursing or mental health staff at least every half hour, and that after four hours, the individual must be released or, if too disturbed and dangerous, transferred to a municipal hospital ward.

69.     The Officer and Medical Defendants, who were responsible for Mr. Ballard's care between September 4, 2013 and his death on September 11, 2013, utterly disregarded these regulations and deliberately neglected Mr. Ballard's need for medical treatment.

70.     Mr. Ballard had a mental health appointment scheduled for September 4,

18

but Laura Van Wyk, the social worker who was supposed to conduct the appointment never saw Mr. Ballard and never scheduled him for a make-up appointment.  And although he required insulin to live and had been prescribed Metformin, to be taken twice a day for his diabetes, and an antipsychotic to be taken each day at bedtime, the Medical Defendants, who were required to visit his cell at least twice daily, never visited his cell that day or otherwise provided him with the medication he required.

71.     On the day that Mr. Ballard was locked into his cell, Dr. Yugundo Park reordered one medication that had been prescribed for Mr. Ballard's diabetes, but he did not reorder the insulin that Mr. Ballard needed.  Dr. Park did not review Mr. Ballard's chart prior to renewing his medication and so did not notice that Mr. Ballard required but was no longer receiving insulin.  Due to the complete indifference of Drs. Ali and Park and the other Medical Defendants who should have reviewed his chart during scheduled clinical visits or while managing or administering his medication, Mr. Ballard had not received any insulin for several days before he was locked in his cell, never received it while he was locked in his cell, and ultimately died, seven days later, from lack of insulin.

72.     In the early morning hours of Thursday, September 5, Mr. Ballard's cell began to flood.  Multiple DOC officers, including Captain Timothy Johnson and CO Mario Carrillo, looked inside his cell repeatedly and saw that the cell was overflowing with water, but none of them entered or took any steps to help Mr. Ballard clean his cell, provide him with access to clean water, or determine whether he required medical or mental health attention.  When Johnson returned to the unit for his next shift twenty-four hours later, he saw that Mr. Ballard was in the same wet and dirty cell, but once again, although he was the area supervisor, Johnson did not have Mr. Ballard's cell changed or cleaned.  In fact the only step that any officer took to

address the flood in Mr. Ballard's cell was to summon a plumber the next morning, who turned off the water to Mr. Ballard's cell.  Captain Frederick, among other officers, was present while the water was being turned off, but none of them recorded it, took any steps to ensure that it was ever turned back on, or informed DOC staff on the following tour that the water had been turned off.  Instead, they left Mr. Ballard without access to water or a functioning toilet until his death.

73.     Throughout the day on September 5, Mr. Ballard continued to be ignored by the Officer and Medical Defendants.  He was scheduled for a diabetic clinic appointment for that day, but when he did not arrive, defendant Dr. Nageh Garas simply wrote in Mr. Ballard's chart that he had been "rescheduled."  Neither Garas nor any other Corizon or City employee inquired into the reason for the missed appointment or took any action to follow up.  At around 5:00 p.m. that evening, physician assistant Froilan Suarez stood outside the door of Mr. Ballard's cell and spoke to him for a matter of seconds but remarkably did not enter to evaluate his physical or mental state or provide him with medication.

74.     Additional medical providers entered the housing area and provided other inmates with medication throughout the day, but none stopped to speak with Mr. Ballard or in any way attend to him.  Sabukutty Abraham, a Corizon pharmacy specialist, was responsible for distributing medicine every evening from September 5 through September 9.  Each evening, he stood in the day room, consulted his medication list, and handed out medication to inmates who lined up.  Because Mr. Ballard was locked inside his cell, he could not line up, and Abraham did not provide him with his prescribed medication on any of the evenings he was required to do so. He did not notice that Mr. Ballard had not received his required medication and he made no record of the omission.

75.     At no time on September 5 was Mr. Ballard offered medication or evaluated by a medical or mental health professional.

76.     That night and the following morning, the Defendant Officers on duty, including Captain Johnson, looked into Mr. Ballard's cell repeatedly, but no one attended to him in any way.  Medical providers entered the housing area, but none saw or treated Mr. Ballard.  By the morning of Friday, September 6, Mr. Ballard was beginning his second full day without medicine.

77.     On September 6, DOC officers, including Captain Johnson, Captain Darron Frederick, Assistant Deputy Warden Andoure Grant, Captain Moses, and CO Peter Gerstant, repeatedly stopped outside the door to Mr. Ballard's cell, sometimes looking in through the window, sometimes speaking to him briefly.  They were acutely aware of Mr. Ballard's rapidly deteriorating mental and physical health, as his schizophrenia and diabetes grew increasingly uncontrolled.  Every day, Mr. Ballard was more and more frequently naked inside his cell, and he was leaving clothing and sheets soiled by feces by his door that DOC officers periodically collected. By the time Johnson, Frederick, Grant, Moses, and Gerestant visited Mr. Ballard on September 6, his cell had been flooded for over twenty-four hours, his water was disconnected and the cell was appallingly unsanitary.  The odor from Mr. Ballard's cell was by then so overpowering that an inmate looking into the cell had to place his shirt over his nose.  As determined by the SCOC, the supervising officers "failed to make a command decision and take proper action of an obvious health and safety situation."  At the time, Inmate Eliezer Pardo was so concerned about Mr. Ballard's condition that he spoke with Officer Mario Carrillo, who had already noticed that Mr. Ballard needed help.  In addition to the filth and the nudity, Carrillo saw that Mr. Ballard's testicles were swelling and looked injured.  Carrillo spoke with Captain

21

Frederick about the injury and suggested that Mr. Ballard be referred for mental health treatment; Frederick ignored the warning. Carrillo did nothing more to ensure that Mr. Ballard get the medical care he urgently needed.

78. Again, the medical and mental health providers responsible for Mr. Ballard's unit on September 6 paid no attention to him, and they did not provide him with any medication, access to clean water, or medical or mental health care. Defendant LPN Durandisse falsified an entry in Mr. Ballard's medical chart to cover up his lack of care for his patient. Knowing that Mr. Ballard's diabetes required constant monitoring, he wrote in the chart that he had performed a finger stick and blood glucose check at 5:46 p.m. He listed Mr. Ballard's blood glucose reading as 95. But, as confirmed by video camera footage of the cell in which Mr. Ballard was confined, no medical personnel entered Mr. Ballard's cell on September 6, and he was never removed from the cell. The closest thing to mental health or medical services Mr. Ballard received that day was a brief glance into his cell by Corizon mental health clinician Philip Whittingham. Whittingham looked into the cell at 7:00 p.m., but he did not speak to Mr. Ballard or take any steps to address Mr. Ballard's obvious medical and mental health crisis.

79. Throughout the night of September 6 and the morning of Saturday, September 7, officers continued to look into Mr. Ballard's cell without doing anything more. That afternoon, CO Carrillo drew the attention of Emmanuel Charles, a Corizon mental health clinician, to Mr. Ballard's cell and pointed out to him that Mr. Ballard's testicles were probably infected and that he needed help. Charles stood outside of the cell and listened to Carrillo for less than a minute before moving on without speaking to Mr. Ballard. A second medical provider visited the housing area later that afternoon but did not approach Mr. Ballard's cell. At around 7:30 that evening, CO Gerestant looked into Mr. Ballard's cell with his flashlight while inmate

22

Pardo told him that he had seen pus leaking down Mr. Ballard's legs.  Pardo insisted to Gerestant that Ballard desperately needed medical attention.  Gerestant did nothing to help him obtain it.  As day turned into night, and the morning of Sunday, September 8 arrived, the officers on duty, including three captains, continued to look into Mr. Ballard's cell, witnessing his increasing distress but doing nothing to stop it.  Medical providers continued to visit inmates on the unit, but none of them spoke to Mr. Ballard.

80.      On September 8, Mr. Ballard continued to be denied medication.  A nurse, John Doe # 1, visited his cell but did not offer him the medication or care that he desperately needed.  Other medical providers, John Does # 2-6, visited the unit but did nothing to help Mr. Ballard.  Between 4:00 and 5:00 that evening, ADW Hallett looked inside Mr. Ballard's cell and then quickly walked away waving her hand in front of her face to dispel the awful odor coming from the cell but doing nothing to help Mr. Ballard or clean his cell.  Carrillo, who was on tour and looked inside Mr. Ballard's cell multiple times that day, again spoke about Mr. Ballard to Captain Frederick, who was on the unit to serve another inmate with an infraction.  But neither officer took any action to help Mr. Ballard.

81.      That night and early the following morning, officers continued to peer inside Mr. Ballard's cell.  At around 10:30 on the morning of Monday, September 9, a delegation of officers toured the unit.  They were escorting Deputy Warden Turhan Gumusdere on a tour, several days after his appointment as chief Security Officer for the jail.  Among them were Assistant Deputy Warden John Gallagher, who opened Mr. Ballard's door and spoke with him for several minutes, and Captain Arnold Marshall.  DW Gumusdere and Captain Marshall had a clear view into the cell and looked directly at Mr. Ballard as ADW Gallagher spoke with him.

82.     By now, after five days of inhumane, unjustified, and illegal segregation and deprivation, Mr. Ballard's acute physical and mental suffering and deterioration were glaringly obvious.  Gallagher, Gumusdere, and Marshall all saw that the cell was full of human waste and garbage and found the smell overwhelming.  Ballard's legs were coated in pus from his swollen and rotting testicles, and a filthy sheet was wrapped around his waist.  But Gallagher, Gumusdere, and Marhsall, like all of their colleagues, did nothing to have Mr. Ballard's cell cleaned or his access to water restored, or to provide him with medical or mental health assistance.  Rather, after about two minutes of conversation with Mr. Ballard, Gallagher directed that Mr. Ballard's cell again be locked, and he, with the rest of the delegation, left Mr. Ballard, once again, to himself.  Throughout the remainder of the day, officers, including Captain Johnson, looked into Mr. Ballard's cell and spoke with him but did not provide him with access to running water, medicine, or care.  Medical providers, John Does # 7-11, passed through the unit but did not stop at Mr. Ballard's cell.

83.     Tuesday, September 10 was Mr. Ballard's last morning alive.  In the early morning, Captain Johnson and ADW Hallett each toured the unit, looked into Mr. Ballard's cell, and walked by without taking any action to assist Mr. Ballard.  At around dawn, several officers, including Captain Johnson, watched another inmate place a tray of food inside Mr. Ballard's cell. The officers saw that Mr. Ballard had vomited and defecated on himself as his body began to shut down.  The stench emanating from the cell was so overpowering that the inmate delivering food covered his nose with his shirt, and the officers backed away from the cell.  Johnson and his colleagues did not try to help Mr. Ballard or summon medical assistance.

84.     Hour after hour, Mr. Ballard grew still sicker and weaker.  He lay alone on the floor of his cell, covered in excrement.  Shortly before 10:00 a.m., a medical provider, John

24

Doe # 12—a Corizon nurse practitioner—was in the housing area, but ignored the stench and passed by without stopping to speak with or tend to Mr. Ballard.  Other medical providers, John Does # 13-17 likewise visited the unit but provided Mr. Ballard with no assistance, despite his evident suffering.

85.     No medical or mental health provider visited Mr. Ballard on September 10, but at 10:33 a.m., defendant Garas made an entry into Mr. Ballard's chart, noting that Mr. Ballard had pending or missed labs, which were not specified; that all necessary labs, which again were not specified, had been ordered; that a tuberculosis blood test was ordered for September 12; and that a special dietary consult was requested.  Garas noted that Mr. Ballard had no current medications, and that he had no serious mental illness.  The information that Garas noted was entirely inconsistent with Mr. Ballard's known and established medical history and contrary to the contents of Mr. Ballard's medical chart, which Garas did not bother to review.

86.     Shortly before noon, a locksmith who happened to be on the unit looked into Mr. Ballard's cell, and, troubled by what he saw, told officer Angel Colon that he had seen an inmate, lying on the floor of his cell, naked.  Colon casually walked away from the cell.  He returned soon after to place a food tray on the floor inside the cell and then once again locked the door and left, leaving Mr. Ballard lying alone on the floor.

87.     Hour after hour, throughout the day as Mr. Ballard slowly suffered, officers passed by his cell, covering their faces to protect against the foul odor and peering downward to look at him where he lay.  No one entered his cell or called for medical assistance.  At 5:00 p.m. that evening, a medical provider, John Doe # 18, came to Mr. Ballard's tier and spoke with other inmates in nearby cells, but he bypassed Mr. Ballard's cell.  An hour later, at around 6:00 p.m.,

Captain Johnson looked into the cell; he did so again at around 6:45, but he did nothing to relieve Mr. Ballard's growing distress.

88.     Soon after, at around 8:30 p.m., Assistant Deputy Warden Elaine Barrett noted that Mr. Ballard was lying motionless in the cell, and she was overwhelmed by the stench coming from the cell.  By this time, Mr. Ballard was struggling to breath, and could only mumble incomprehensibly in response to Barrett's inquiries about his condition.  As she stood outside looking in, Barrett kicked the door several times.  Nearby was CO Alexander McDonald, who was assigned that day to Harts Island Clinic but was on unit C-17 to transport inmates to and from the clinic.  Barrett told McDonald to have Mr. Ballard seen by mental health staff but did not state that he required immediate assistance or indicate in any way that her instruction was urgent. McDonald responded by walking to Mr. Ballard's cell, looking inside, kicking the door, and moving on.  He did not submit a referral for treatment, summon medical or mental health assistance, or take Mr. Ballard to the clinic, and neither McDonald nor Barrett did anything further to ensure that Mr. Ballard received the emergency care he needed.

89.     At 8:43, 9:05, 9:12, 9:42, 9:46, 10:23, 10:25, 10:20, and 10:49 p.m., one officer after another looked into the cell, saw Mr. Ballard—naked, filthy, and collapsed—and walked on.  Shortly after 8 p.m., two inmates told CO Henderson Blades that there was something terribly wrong with Mr. Ballard's testicles and that he was either dead or dying. Blades approached the cell shortly afterwards and looked inside.  He noticed that Mr. Ballard was having trouble breathing.  Among the other officers who noticed that Mr. Ballard was having trouble breathing throughout the evening were Mohamed Siddique and Gregory Jerrick.  Between 8:30 and 9:30 p.m., each of these officers notified Captain Johnson and/or CO Jhulian Newell-Little that Mr. Ballard was having difficulty breathing and needed medical attention.  Johnson was

26

again on duty as the area supervisor, and Newell-Little was the "A" officer, whose responsibility it was to call the clinic if an inmate needed medical assistance.  Inmate Pardo begged both of them to get Mr. Ballard medical assistance.  Between 8:00 and 9:00 p.m., Pardo first desperately told Newell-Little that Mr. Ballard was not breathing, was lying naked on his bed in an alarming position, had pus running down his legs and swollen testicles, and urgently needed help.  When Newell-Little did nothing in response, Pardo spoke to Johnson, telling him that Mr. Ballard had not gotten out of bed all day and that his cell reeked of pus and an infection.  Neither Johnson nor Newell-Little called for medical assistance.

90.     Finally, shortly before 11:00 p.m., Jerrick called medical staff to Mr. Ballard's cell.  Defendants Dr. Ahmed Haider and LPN Armel Durandisse responded to the summons.  When they arrived at Mr. Ballard's cell, he was still alive but too weak to move.  He lay naked on a floor scattered with food, feces, vomit, and other filth.  Johnson arrived soon after.

91.     Contrary to sound medical practice and basic humanity, Haider and Durandisse did not rush to Mr. Ballard's aid.  Instead, they hung back, elected not to enter the fetid cell, and instructed two inmates to bring Mr. Ballard out.  The inmates placed Mr. Ballard on a blanket on a gurney and brought him into the corridor.

92.     Haider, Durandisse and Johnson immediately observed Mr. Ballard's extremely soiled and perilously weak condition.  They also saw that Mr. Ballard's genitals were alarmingly infected.  His penis was denuded.  At some point during his confinement Mr. Ballard had tied a rubber band tightly around his genitals, where it remained, unnoticed and/or ignored by the Officer and Medical Defendants, until his skin had rotted off.

93.     This horrific, excruciating, and ultimately fatal injury was an utterly foreseeable consequence of the neglect and isolation that the Officer and Medical Defendants inflicted on Mr. Ballard, knowing that they would aggravate his tendency toward self-injurious behavior.

94.     Mr. Ballard was clearly on the brink of death, yet he lay neglected on the gurney as the Haider and Durandisse held back, unwilling even to touch his body.  For an inexcusable period, they continued to stand idly by and do nothing.

95.     As the minutes ticked by, Mr. Ballard's heart stopped.  When Dr. Haider finally took action, it was only to place a stethoscope against Mr. Ballard's back and wheel him to the mental health clinic.  Dr. Haider did not resuscitate Mr. Ballard; Durandisse did nothing to save his life.

96.     Had Haider and Durandisse acted swiftly and in accordance with sound medical practice, Mr. Ballard might have survived.

97.     But they did not, and Mr. Ballard was in full cardiac arrest when urgent care physician Frank Flores and an EMT technician arrived at the prison clinic.  Dr. Flores and the EMT technician intubated and briefly resuscitated Mr. Ballard and then transferred him to Elmhurst Hospital Center.  But Mr. Ballard's heart stopped a second time on the way to the hospital.  Doctors at Elmhurst Hospital again revived Mr. Ballard, but only briefly before his heart stopped beating for a third and final time. Mr. Ballard was pronounced dead at 1:31 a.m. on September 11, 2013.

98.     The doctors who treated Mr. Ballard at Elmhurst Hospital diagnosed him with diabetic ketoacidosis—a poisonous buildup of acids in the blood due to lack of insulin,

which is a known and easily avoidable complication of diabetes—and general ischemia—a restriction of blood supply sufficiently prolonged to cause cellular death.

99.     On June 3, 2014, following an autopsy, the New York City Office of Chief Medical Examiner ("the Medical Examiner") declared Mr. Ballard's death a homicide.  Mr. Ballard experienced extreme pain and suffering, emotional distress, and death as a result of defendants' misconduct, including but not limited to their cruel and unusual treatment of Mr. Ballard, their deliberate indifference to his medical needs, and their medical malpractice.

100.    In a report issued on December 16, 2014, the New York State Commission of Correction ("SCOC"), which investigated Mr. Ballard's death, squarely and unequivocally held both Corizon and DOC responsible for Mr. Ballard's "preventable death."  The SCOC found Corizon's treatment "so incompetent and inadequate as to shock the conscience . . . . Had Ballard received adequate and appropriate medical and mental health care and supervision and intervention when he became critically ill, his death would have been prevented."  The SCOC further confirmed that Ballard's death resulted from a culture of unconstitutional disregard for the inmates in DOC's and Corizon's care:  "Ballard's deteriorating health and mental status was observed over the course of this six day period by many NYC DOC officers, supervisors, and administrators, together with clinicians employed by Corizon Inc., who showed deliberate indifference to Ballard's serious medical needs by collectively failing to provide the very basics of medical care and failing to take appropriate action in a timely manner to a medical emergency which resulted in Ballard's death."

101.    The SCOC also recommended that DOHMH further investigate the conduct of, and review the care provided by, Medical Defendants Haider, Garas, Park,

Durandisse, Green, Anusionwu, and all clinic staff assigned to conduct rounds in the mental

health area of AMKC between September 4 and 10, 2013.  The SCOC further recommended that

the DOC Commissioner, defendant Dora Schriro, remove the warden of AMKC, defendant Rose

Agro, from her position, and that the Commissioner investigate the conduct of Officer Defendants

Assistant Deputy Warden Grant, Assistant Deputy Warden Gallagher, Captain Marshall, Assistant

Deputy Warden Barrett, and Captain Johnson.  DOHMH, which also reviewed Mr. Ballard's

death, counseled at least three Medical Defendants—Anusionwu, Suarez, and Green—for their

conduct in connection with his death.  The DOC Investigation Division, like SCOC, condemned

Corizon for its conduct with respect to Mr. Ballard.  It further recommended that charges be

issued against Officer Defendants Captain Johnson, Assistant Deputy Warden Gallagher, Officer

McDonald, Captain Frederick, Assistant Deputy Warden Grant, Assistant Deputy Warden Barrett,

Deputy Warden Gumusdere, and Assistant Deputy Warden Hallet.

**A Custom, Policy, and Practice of Abusing and Failing to Treat Mentally Ill Inmates at Rikers**

102.    For decades before Mr. Ballard's death, DOC, CHS, and Corizon were

aware of the routine, dangerous, and unconstitutionally deliberate indifference by corrections

officers and medical providers in the City's jails to the medical and mental health of inmates with

serious mental illnesses—the same indifference that ultimately took Mr. Ballard's life.

103.    Since at least the early1980s, the New York City Board of Correction

("BOC"), DOC, and CHS have recognized that inmates suffering from mental illness are

particularly vulnerable in City jails, and that correctional and medical staff who are not specially

trained and monitored will place such inmates at serious risk.

104.    Accordingly, in 1985, the City adopted Mental Health Minimum Standards for the City jails, which established minimum standards for, among other things, the mental health training of correctional and medical staff, the provision of medical and mental health services to inmates, and the design of housing areas to minimize inmates' distress and self-injurious behaviors.

105.    DOC, CHS, Corizon, and the Senior Defendants persistently and knowingly failed to ensure that these standards were satisfied, even though they understood them to be essential for protecting the basic rights and safety of one of Rikers Island's most vulnerable populations.

106.    DOC, CHS, Corizon and the Senior Defendants have consistently failed to staff Rikers Island's mental health units with steady, adequately trained correction officers and mental health professionals.  They have also permitted and arranged for overcrowding of Rikers Island's mental health units, including unit C-71, despite knowing that overcrowded and unduly stressful environments present serious risk of injury to mentally ill inmates.

107.    On information and belief, prior to Mr. Ballard's death, an accrediting organization based in San Francisco visited Rikers Island's mental health units and reported to DOC and CHS that the physical plant was one of the worst it had ever seen for management and treatment of mentally ill inmates.

108.    DOC and the Senior Defendants have also tolerated and encouraged the excessive and profoundly destabilizing use of solitary confinement of the type that Mr. Ballard endured, even as they recognized the grave dangers of such a practice.  According to data collected by DOHMH, and known to the City and the Senior Defendants at the time of Mr.

Ballard's ordeal, from 2007 through 2012 the number of self-inflicted mutilations and suicide attempts by Rikers inmates increased by more than 75% as the number of prisoners in punitive segregation increased by 70%.

109.    In the years and months leading up to Mr. Ballard's death, the City, Corizon, and the Senior Defendants were acutely aware of the rampant abuse and neglect of inmates at Rikers Island who, like Mr. Ballard, suffered from serious mental illnesses.

110.    In the summer of 2013, DOC, CHS, and the Senior Defendants collected and reviewed extensive materials concerning punitive segregation of mentally ill inmates, mental health training for correction officers, and injury to and self-harm by mentally ill inmates.  They also commissioned and studied a detailed analysis by two professors of psychology concerning the treatment of mentally ill inmates at Rikers Island.  During this time, DOC, CHS, and BOC administrators, including Commissioner Schiro, made multiple visits to the Rikers Island mental health units, including unit C-71 at AMKC, to observe the treatment of mentally ill inmates at the jail.  *See* New York City Board of Correction, *Motion to proceed with rule making regarding punitive segregation on Rikers Island*, Aug. 22, 2013, *available at* http://www.nyc.gov/html/boc/downloads/pdf/Memo%20to%20the%20Board%20% 2008222013.pdf.

111.    This review confirmed what the City, Corizon, and Senior Defendants already knew: that correction and medical staff were not adequately trained to avoid dangerous and self-injurious behaviors by mentally ill inmates; that punitive segregation of mentally ill inmates was a dangerous and counterproductive yet rampant practice; that correction officers routinely responded to even the slightest perceived acts of disrespect with unjustified physical

force and punishment, including solitary confinement; that mental health staff were not providing adequate services to inmates who were segregated; and that the environment in which mentally ill inmates were housed was unnecessarily and excessively stressful, exacerbating their symptoms and increasing the likelihood of violence and self-harm.  In sum, by the time that Mr. Ballard was cruelly and unlawfully confined and eventually killed for having danced in a way that offended an officer, the City, Corizon, and the Senior Defendants were acutely aware that correctional and medical and mental health personnel at Rikers Island's mental health units, including C-71, were inadequately trained and were systematically violating the Mental Health Minimum Standards and any standard of medical and mental health care.  They also knew that such conditions were exacerbating inmates' mental illnesses and causing them serious harm.  *See* Drs. James Gilligan & Bandy Lee, *Report to the New York City Board of Correction*, Sept. 5, 2013, *available at* http://solitarywatch.com/wp-content/uploads/2013/11/Gilligan-Report.-Final.pdf.

112.    Mr. Ballard's death was just one in a series of horrific episodes that have made tragically clear the consequences of DOC's, CHS's, and Corizon's systematic failure to ensure either adequate access to medical care for Rikers inmates suffering from mental illness or sufficient training for those responsible for the inmates' well-being.

113.    Approximately one year before Mr. Ballard died, on August 18, 2012, the City, Corizon, and Senior Defendants witnessed the gruesome death of Jason Echevarria, which similarly resulted from the deliberate indifference of Rikers Island correction officers.  Mr. Echevarria was known to suffer from bipolar disorder and was held at a mental health observation unit at Rikers Island following multiple suicide attempts.  Mr. Echevarria swallowed a packet of undiluted highly toxic detergent, which was improperly given to him by a correction officer.  Mr. Echevarria began vomiting, and for several hours he banged on his cell door, shouting in pain and

screaming for help.  The guards and supervisors responsible for Mr. Echevarria's safety made a deliberate decision not to summon medical assistance, and he slowly suffered to death inside his cell.  The Medical Examiner declared Mr. Echevarria's death a homicide, resulting from "neglect and denial of medical care."

114.    The pattern of deliberate neglect of inmates on Rikers Island's mental health units has continued to have appalling consequences even after the death of Mr. Ballard. For example, on February 15, 2014, Jerome Murdough, another inmate suffering from mental illness, baked to death in a Rikers Island cell.  Mr. Murdough's psychotropic medication made him particularly susceptible to heat, but he was locked inside a cell that was over 100 degrees. Correction officers were supposed to check on Mr. Murdough every 15 minutes, but he was left alone for about four hours by an officer who had a history of abandoning her post.  By the time an officer finally visited Mr. Murdough's cell, he had died.

115.    Mr. Echevarria's death in August 2012 alerted the City, Corizon, and the Senior Defendants to the dire ramifications of their customary disregard for the training, staffing, and other basic requirements reflected in the Mental Health Minimum Standards, which they knew to be essential for the physical and mental welfare of mentally ill inmates.  But in September 2013, the City, Corizon, and the Senior Defendants were still not taking even the most elemental precautions to protect inmates from harm.

116.    From the afternoon of September 3 (the day before Mr. Ballard was locked in his cell) through the night of September 10 (when he was finally removed from his cell and taken to the clinic), 53 officers worked in his housing area in AMKC mental health unit C-71.

Not one of them had received the mental health training that City regulations require for officers assigned to a mental health unit.

117. In addition, while the Mental Health Minimum Standards requires that only regularly assigned, or "steady," correction officers work on mental health units, only one of the 53 officers—and none of the 11 captains—who worked on unit C-71 between September 3 and September 10 was regularly assigned to the post.

118. Furthermore, in September 2013, when Mr. Ballard was living on unit C-71, its inmate population was at approximately 120% maximum capacity.

119. In addition, for years prior to Mr. Ballard's death, the City, the Senior Defendants, and Corizon all knew that the medical failures that led to Mr. Ballard's death were chronic problems at Rikers and allowed them to persist. Each year, the City evaluated the performance of Corizon and its predecessor, Prison Health Services, Inc., in New York City jails. Quarter after quarter, beginning in at least 2008, these reviews showed that medical charts were not adequately completed, medical notes were often not filed, documentation concerning chronic problems and test results was regularly missing from patients' files, care was frequently not delivered without any refusal of care form being placed on file, preventable hospitalizations resulted from insufficient documentation for patients with chronic problems and failures to appropriately assess treatment plans, patients were not timely seen or not seen at all for mental health visits or chronic care visits, and patients with multiple chronic problems often had only one of their problems addressed at any medical visits they did receive. By the third quarter of 2013, when Mr. Ballard died, a stunning 77% of all chronic care patient visits were not completed as scheduled, with many notes indicating that "the appointment exceeds available time slots"—the

very same reason that Mr. Ballard's medical and mental health needs were disregarded upon his return to Rikers from Bellevue Hospital. Eighty percent of the failed visits in the third quarter of 2013 throughout the City's Jails occurred at AMKC and just two other facilities. Seventy-five percent of the patients not seen for treatment of chronic diseases, like Mr. Ballard, had mental health and/or substance abuse problems. More than half of those were, again like Mr. Ballard, at AMKC.

120.    These are but several examples of the City's, the Senior Defendants', and Corizon's chronic deliberate indifference to the medical and mental health needs of inmates and their failures to take sufficient measures to curb the abuse and neglect that is directed daily toward inmates of the Rikers Island mental health units. Corizon, the City, and the Senior Defendants have allowed that abuse and neglect to persist through inadequate training, oversight, and discipline.

121.    The City, Corizon, and the Senior Defendants knew that their failure to train and oversee the correction officers and medical and mental health providers working on AMKC unit C-71 could cause the mental and physical degeneration, and even death, of unstable and vulnerable inmates. They disregarded this serious risk to the health and safety of those in their care, and as a result, Mr. Ballard was needlessly killed at the age of 39.

**A Nationwide, Profit-Driven Custom, Policy, and Practice of Deliberate Indifference by Corizon**

122.    At the time of Mr. Ballard's death, as the City knew or should have known, Corizon medical and mental health providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely failed to accurately maintain or review patients' charts, and routinely denied patients access to needed doctors and medication, all of

36

which placed the health and lives of Corizon's patients at risk. These are the very practices that killed Mr. Ballard. Mr. Ballard died in part because Corizon medical and mental health providers prescribed him improper psychotropic medications; discontinued the insulin on which his life depended after failing to review his medical history; denied him required clinical appointments and medical treatments without explanation or follow-up; ignored his need for medical and mental health treatment for days on end, even as they walked past his cell and observed him in both physical and mental anguish; and failed to summon emergency medical assistance even when they saw him on the brink of death.

123.    These are the customary and known practices that result from cost-cutting measures adopted by Corizon to maximize profits by, among other things, inadequately staffing facilities, employing unqualified staff, failing to train or vet staff, and delaying and denying and life-saving care even in emergency situations.

124.    Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare ("PHS"). Under each of these names, Corizon has had a long and well-publicized history of sacrificing the health and lives of inmates for profit. Corizon, which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work."

125.    One year before Mr. Ballard's ordeal, the Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon*

*Health, Inc.*, 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields.  Mr. Fields had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum.  The Eleventh Circuit affirmed the jury's finding that Mr. Fields's anguish resulted from PHS's policy of "delay[ing] treatment to save money," which it "implemented . . . with deliberate indifference as to the policy's known or obvious consequences" for the company's patients.  *Id*. at 184-85 (internal quotation marks and alterations omitted).

126.    According to published reports, Jovon Frazier likewise died because of Corizon's profit-seeking practice of denying patients access to outside doctors or facilities, or even to Corizon doctors or physicians assistants.  Despite months of persistent and increasingly desperate complaints of severe pain, Mr. Frazier was allowed to see only nurses and never a doctor, and he was offered no treatment other than Tylenol.  When he was finally taken to a hospital, a cancerous mass was discovered in his shoulder.  It cost him first his left arm and then, in September 2011, his life.  A 2014 investigation by the Palm Beach Post revealed that Mr. Frazier was only one of numerous Florida prisoners—Donna Pickelsimer, Anthony Carvajal, and Tammie White among them—whose end-stage cancer symptoms were disregarded by Corizon employees and treated with Tylenol and ibuprofen.

127.    These were far from the only victims of Corizon's inhumane penny-pinching practices in Florida.  A 2015 investigation at Florida Women's Reception Center in Ocala found that a woman with diabetes had gone almost three months without insulin, inmates at risk of self-harm were denied psychiatric care while being held in isolation far longer than regulations allowed, and mentally ill inmates were inexplicably taken off their prescribed

psychiatric medications.

128.    By January 2013, approximately 100 days after Florida turned over healthcare for the vast majority of its inmates to Corizon, the monthly inmate death count shot to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. Monitoring reports found that, consistent with Corizon's mistreatment of Mr. Ballard, medical staff failed to make rounds for months on end, falsified records indicating that doctors or nurses saw inmates, left basic information off of inmates' medical charts, and gave inmates medication without, or contrary to, the advice of doctors.

129.    Audits and reviews of Corizon in other states reflect the same custom and policy of providing substandard care to cut costs.  A February 2012 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners.  Just as Mr. Ballard was left to languish in his cell, terminally ill and long-term care prisoners in Idaho were left on soiled linens, given inadequate pain medication, and forced to endure long periods without food or water.  Responses to prisoners' requests for medical attention were delayed, or their requests were entirely ignored; the same was true in emergency care situations, as inadequately trained staff working without the supervision of registered nurses or physicians were slow to respond.  The Idaho report found Corizon staffing inadequate and incompetent, and mental healthcare deficient.  Corizon staff kept incomplete records and failed to follow up with patients or provide face-to-face evaluations of individuals prescribed psychotropic medications.  Corizon's operations in Idaho failed 23 of 33 audit categories in 2010 and 26 of 33 categories in 2011.

130.    Similar deficiencies were found in a November 2011 audit of CMS's

performance in Maine prisons: 38% of patient files had inadequate or inaccurate documentation or were inadequately maintained; 11% of sick calls were never or not timely resolved; staff was inadequately trained; and medications were routinely improperly administered.  When Maine refused to renew Corizon's contract in 2012, prisoner complaints about their medical care precipitously dropped.

131.    A 2014 report detailing failures of medical care by Corizon in Alabama prisons attributed multiple deaths and serious injuries to "extraordinary understaffing," which caused crises including the failure to monitor diabetic patients and slow or nonexistent emergency responses—the very same failed monitoring and lack of emergency care that left Mr. Ballard languishing to death.

132.    The Alabama report echoes one from Arizona issued in October 2013, which likewise details cases of Corizon's neglect and mistreatment of inmates.  In surveys, Corizon nurses in Arizona confirmed the blistering contents of the report, relating that patients were deprived of urgent medical care because facilities were understaffed and the limited medical personnel who were available were inadequately trained.

133.    Meanwhile, in September 2013, the very month that Mr. Ballard died, Louisiana canceled its contract with Corizon, and six Corizon employees subsequently resigned in light of seven health-care related deaths that occurred in the state's prisons over as many months in 2012.  At least three of the deaths were preventable.  One bears chilling similarities to Mr. Ballard's death:  On August 8, 2012, Samantha George, a severe diabetic also suffering from a bacterial infection, died after complaining of fever and pain.  While Ms. George lay in her cell partially naked and unresponsive, Corizon staff repeatedly peered into her cell but did nothing to

assist her.  The only doctor on duty was off-site and told the nurse who contacted him that he would examine Ms. George the following day.  By then, Ms. George was dead.

134.    Corizon and CMS's pattern of delayed or denied medical care killed at least nine additional people and caused serious or critical injuries to 21 others in Minnesota before the state cancelled its contract with Corizon in 2013.  A 2014 audit of Corizon's performance in Minnesota found that the deaths and injuries were in large part attributable to inadequate staffing. In order to cut costs, on weekdays after 4:00 p.m. and on weekends, Corizon paid a single doctor to be on call for the entire state prison system.

135.    According to published accounts, one Minnesota victim of this policy was Xavius Scullark-Johnson, a schizophrenic man who died in circumstances distressingly akin to Mr. Ballard's torturous final days.  In May 2013, Mr. Scullark-Johnson suffered seven seizures in his cell, where he was left for nearly eight hours with no care.  He was found soaked in urine on the floor of his cell, but still no ambulance was called for several more hours.  When the ambulance finally arrived, a Corizon nurse turned it away because allowing Mr. Scullark-Johnson to travel by ambulance to a hospital would have violated Corizon protocols designed to cut costs. Without access to hospital care, Mr. Scullark-Johnson soon died.

136.    Lawsuits throughout the country, in Alabama, Arizona, California, Forida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses."  According to one Florida newspaper, Corizon was sued at least 660 times for malpractice in the five years preceding Mr. Ballard's death.  A more recent survey counts 1300 such lawsuits in five years.

137.    As New York City was contracting with Corizon to care for Mr. Ballard and his fellow inmates, other states were cancelling their contracts with Corizon one by one, faced with the suffering and deaths that Corizon's cost-cutting measures produced.  Corizon lost contracts with state prisons in Vermont (2005), Alabama (2007), Delaware (2010), Maryland (2010), and Maine (2012), and with county jails in Galveston, Texas (2007), Pima County, Arizona (2008), and Monroe County, New York (2010), almost always following allegations by officials that the company was not providing adequate healthcare.  These contract terminations were followed by others in Minnesota, Pennsylvania, Tennessee, Washington, D.C., and Volusia County, Florida, among other jurisdictions.

138.    The City, meanwhile, waited until 2015 before reevaluating its contract with Corizon.  Between 2009 and 2015, Corizon's provision of substandard medical care had been found by the SCOC to have caused up to a dozen deaths at Rikers.  By the time the City cancelled its contract with Corizon, it was too late for those dozen individuals, including Mr. Ballard.  Long before 2015, Corizon's staff, following the company's well publicized and widely decried practices, had already tortured him to death.

139.    At the time of Mr. Ballard's death, Corizon knew that its deliberate strategy of cutting costs by, among other things, understaffing facilities, inadequately screening and training employees, and denying patients access to needed care, placed those in its care at serious risk of grave illness and even death.  The City and the Senior Defendants likewise knew or should have known of Corizon's deadly practices, but they disregarded the wellbeing of the individuals in their custody, with fatal consequences for Mr. Ballard among so many others.

**Plaintiff's Notices Of Claim**

140.    Within ninety days of Ms. Griffin's appointment as administratrix of Mr. Ballard's estate, written notices of claim, sworn by Ms. Griffin, were served upon the City by personal delivery of notice, in duplicate, to the Comptroller's office at 1 Centre Street, New York, New York.

141.    On October 28, 2014, an order of the Supreme Court of the State of New York, New York County extended the time pursuant to N.Y. Mun. Law § 50-e(5) for Ms. Griffin to file a notice of claim on behalf of Mr. Ballard's estate.

142.    At least thirty days have elapsed since service of the notices of claim, and adjustment or payment of the claim has been neglected or refused.

143.    Plaintiff filed a complaint within one year and ninety days of the start of Mr. Ballard's mistreatment and two years after Mr. Ballard's death.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against All Defendants)

144.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

145.    By reason of the foregoing, and by confining Mr. Ballard to his cell, denying him access to adequate medical and mental health care, failing to provide medical and mental health treatment, and/or exhibiting deliberate indifference to Mr. Ballard's rights by not acting on information which indicated that unconstitutional acts were occurring, the Officer and Medical Defendants deprived Mr. Ballard of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments of the United States

Constitution.  The Officer and Medical Defendants acted at all relevant times hereto willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Ballard that shocks the conscience.  As a direct and proximate result of these violations of Mr. Ballard's constitutional rights, he suffered the damages hereinbefore alleged.

146.   The Senior Defendants knew that the pattern of abuse and neglect against mentally ill inmates, described above in paragraphs 102 to 139, existed on the Rikers Island mental health units prior to and including the time of Mr. Ballard's mistreatment and death.  They created or allowed the continuance of the custom under which mentally ill inmates were illegally and excessively placed in solitary confinement and deprived of adequate medical care.  Their failure to take measures to curb this pattern of abuse and neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Ballard.  The Senior Defendants' conduct was a substantial factor in the continuation of such abuse and neglect and a proximate cause of the constitutional violations alleged in this complaint and of Mr. Ballard's resultant damages, hereinbefore alleged.

147.   The Individual Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as DOC and/or CHS officers, agents, employees, and/or contracted personnel.  Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.  Said Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Ballard of his constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

44

148.     Defendants City, through DOC and CHS, and Corizon, through its officers and employees, acting under the pretense and color of law, permitted, tolerated, and were deliberately indifferent to a pattern and practice of abuse and neglect at Rikers Island's mental health units, as described above in paragraphs 102 to 139, by DOC and CHS officers, employees, agents, and contracted personnel at the time of Mr. Ballard's mistreatment and homicide.  This widespread tolerance of abuse and neglect constituted municipal and corporate policy, practice, and custom, and was a proximate cause of Mr. Ballard's mistreatment and homicide, and plaintiff's resultant damages, hereinbefore alleged.

149.     As described above in paragraphs 122 to 139, Corizon, through its officers and employees, acting under the pretense and color of law, deliberately implemented a nationwide pattern and practice of delaying treatment, inadequately staffing facilities, hiring unqualified personnel, and failing to adequately train personnel in order to cut costs and maximize profits. Corizon implemented its policies with deliberate indifference as to their known, obvious, and proven consequences for patients: serious injury and death resulting from delayed, denied, and improper treatment.  Defendants City, through DOC and CHS, permitted, tolerated, and were likewise deliberately indifferent to the consequences of Corizon's profit-maximizing policies, of which they knew or should have known at the time of Ballard's death.  Corizon's and the City's indifference to the implications for Rikers inmates of Corizon's policies, practices, and customs were proximate causes of Mr. Ballard's mistreatment and homicide, and plaintiff's resultant damages, hereinbefore alleged.

150.     By pursuing, permitting, tolerating, and sanctioning persistent and widespread policies, practices, and customs pursuant to which Mr. Ballard was abused, neglected, and killed, the City and Corizon have deprived Mr. Ballard of rights, remedies, privileges, and

45

immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983 and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

151.   As a direct and proximate result of the misconduct and abuses of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

### SECOND CLAIM FOR RELIEF
**Medical Malpractice**
**(Against the Medical Defendants, the City, and Corizon)**

152.   At all times relevant to this Complaint, the City undertook to provide medical and mental health care to inmates in its custody at Rikers Island, including Mr. Ballard, and it was legally obligated and had a special duty to do so effectively.

153.   The Medical Defendants and defendant Corizon were employed, retained and/or contracted with by the City to provide medical and mental health care to all inmates in the care and custody of the City at Rikers Island, including Mr. Ballard.

154.   The Medical Defendants and Corizon agreed and purported to provide medical care and services to inmates in at Rikers Island, including Mr. Ballard, from June 18, 2013 until September 11, 2013.

155.   The Medical Defendants and Corizon held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of Rikers Island inmates, including Mr. Ballard.

156.   The Medical defendants and Corizon were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Ballard.

157.     Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

158.     Defendant City, as employer of some or all of the Medical Defendants is responsible for their negligence wrongdoing under the doctrine of *respondeat superior*.

159.     Defendant City is also responsible for Corizon's and the Medical Defendants' negligence and wrongdoing because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

160.     As a result of defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Ballard sustained the damages hereinbefore alleged.

161.     A certificate of merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules was annexed to Plaintiff's complaint filed on September 10, 2014.

### THIRD CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**
**(Against the Officer Defendants, the Medical Defendants, the City, and Corizon)**

162.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

163.     Defendants engaged in extreme and outrageous conduct intentionally and recklessly causing severe emotional distress to Mr. Ballard.

164.     By reason of the foregoing, defendants are liable to plaintiff for the intentional infliction of emotional distress.

165.     Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress suffered by Mr. Ballard.

47

166.     Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

167.     Defendant City, as employer of the Officer Defendants and some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

168.     Defendant City is also responsible for the Officer and Medical Defendants' wrongdoing because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

169.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

**FOURTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

170.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

171.     By reason of the foregoing, defendants are liable to Ms. Griffin, both in her capacity as administratrix and in her individual capacity, for the negligent infliction of emotional distress.

172.     Defendants and their officers, agents, servants, and employees were responsible for this negligent infliction of emotional distress.

173.     Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

174.    Defendant City, as employer of some or all of the Individual Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

175.    Defendant City is also responsible for Individual Defendants' negligence because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

176.    As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

### FIFTH CLAIM FOR RELIEF
**Negligent Hiring/Training/Retention of**
**Employment Services**
**(Against the City and Corizon)**

177.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

178.    Defendants City and Corizon owed a duty of care to Mr. Ballard to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to Mr. Ballard or to those in a like situation would probably result from the foregoing conduct.

179.    Upon information and belief, all of the Individual Defendants were unfit and incompetent for their positions.

180.    Corizon knew or should have known through the exercise of reasonable diligence that the Medical Defendants that it employed were potentially dangerous. Corizon's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused plaintiff's injuries.

181.     The City knew or should have known through the exercise of reasonable diligence that the Individual Defendants that it employed were potentially dangerous.  The City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused plaintiff's injuries.

182.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## SIXTH CLAIM FOR RELIEF
### Wrongful Death
### (Against All Defendants)

183.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

184.     By reason of the foregoing, the statutory distributees of Mr. Ballard's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Ballard.  Defendants are liable for the wrongful death of Mr. Ballard.

185.     As a consequence, plaintiff has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### Negligence
### (Against All Defendants)

186.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

50

187.     Defendants owed a duty of care to Mr. Ballard as an inmate at Rikers Island.

188.     Defendants breached the duty of care that they owed to Mr. Ballard by confining him to his cell, denying him access to adequate medical and mental health care, failing to provide medical and mental health treatment, and/or otherwise neglecting his medical and mental health needs.

189.     Defendants' breach of their duty of care was the proximate cause of Mr. Ballard's serious and unnecessary injuries, including severe pain and suffering and death.

190.     Defendant Corizon, as employer of all or some of the Medical Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

191.     Defendant City, as employer of all or some of the Individual Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

192.     Defendant City is also responsible for Corizon's and the Individual Defendants' negligence because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

193.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM FOR RELIEF
### New York State Constitution, Art. I § 12
### (Against All Defendants)

194.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

51

195.     By reason of the foregoing, by denying Mr. Ballard adequate medical care and killing him, defendants deprived him of rights, remedies, privileges, and immunities guaranteed to every New Yorker by Article I § 12 of the New York Constitution.

196.     Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as City and/or DOC and/or DOHMH/CHS officers, agents, or employees.  Said acts by defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Ballard of his constitutional rights secured by Article I § 12 of the New York Constitution.

197.     Defendants, their officers, agents, servants, and employees were responsible for the deprivation of Mr. Ballard's state constitutional rights.

198.     Defendant Corizon, as employer of some or all of the Medical Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

199.     Defendant City, as employer of all or some of the Individual Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

200.     Defendant City is also responsible for Corizon's and the Individual Defendants' negligence because it retained them to perform services that the City had undertaken to perform and was under a special duty and legal obligation to perform.

201.     As a direct and proximate result of the misconduct and abuse of authority detailed above, plaintiff sustained the damages hereinbefore alleged.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff respectfully requests judgment against defendants as follows:

1. awarding compensatory damages in an amount to be determined at trial;

2. awarding punitive damages against the Individual Defendants in an amount to be determined at trial;

3. awarding plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

4. directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: March 11, 2016
        New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP


_____/s_____
Jonathan S. Abady
Debra L. Greenberger
Hayley Horowitz
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

THE LEGAL AID SOCIETY
Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3530

*Attorneys for Plaintiff Beverly Ann Griffin*